Elizabeth J. LAMANNA, Plaintiff,

v.

SPECIAL AGENTS MUTUAL BENEFITS ASSOCIATION, d/b/a/ Samba Group Insurance Plan, Defendant.

Civil Action No. 07–733.

United States District Court,
W.D. Pennsylvania.

March 6, 2008.

Francis M. Moore, Mansmann & Moore, Pittsburgh, PA, for Plaintiff.

Amber M. Schuknecht, Pepper Hamilton, Pittsburgh, PA, David M. Ermer, Gordon & Ermer, Washington, DC, Brian P. Downey, Pepper, Hamilton & Scheetz, Harrisburg, PA, for Defendant.

### MEMORANDUM OPINION

WILLIAM L. STANDISH, District Judge.

## I. INTRODUCTION

According to the Complaint filed in this Court on May 30, 2007, Plaintiff Elizabeth J. Lamanna was insured under a long-term disability insurance plan ("the Plan") administered by Defendant Special Agents Mutual Benefits Association ("SAMBA") while she was employed by the Federal Bureau of Investigation ("FBI.") When she became disabled as a result of significant medical problems beginning in 1996, Ms.

Lamanna sought benefits from Defendant through the Plan. Plaintiff received long-term disability ("LTD") benefits from 1996 through 2004, but SAMBA subsequently determined that although she could not return to her former work with the FBI, she was not completely disabled and her benefits were terminated as of January 30, 2005. Following review and appeal, SAMBA issued a final denial letter on September 30, 2005.

Having exhausted her administrative appeals, Plaintiff filed suit in this Court pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking the full amount of benefits due under the Plan together with attorney's fees and costs as provided by ERISA.

Defendant's answer to the Complaint conceded that SAMBA is the Plan sponsor, named fiduciary and administrator of the Plan, and that at one time, Plaintiff received LTD benefits under the Plan. (Doc. No. 6 at 1–2.) However, Defendant argues the evidence shows that according to the terms of the Plan, Plaintiff was able to perform gainful work other than her own occupation; consequently, SAMBA justifiably terminated her LTD benefits. (*Id.* at 2.)

The parties were unable to resolve the matter amicably and advised the Court that they both believed summary judgment motions were appropriate, based on the extensive administrative record. The Court therefore ordered the parties to file cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, together with concise statements of fact and briefs in support their motions. (Order of Court, September 11, 2007, Doc. No. 12.) The parties having complied with the Order of Court, this matter is now ripe for decision.

After careful consideration and for the reasons set forth below, Plaintiff's motion

for summary judgment (Doc. No. 21) is granted and Defendant's cross-motion (Doc. No. 18) is denied.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiff's claims pursuant to 29 U.S.C. § 1132(e)(1). Venue is appropriate in this district inasmuch as the Plan is administered and Defendant's alleged breaches of duty occurred in this district. 29 U.S.C. § 1132(e)(2).

## III. STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment if the party so moving can show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Sollon v. Ohio Cas. Ins. Co.,* 396 F.Supp.2d 560, 568 (W.D.Pa.2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor. *Sollon, id.,citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992). In short,

the movant must show that if the pleadings, depositions and other evidentiary material were admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Celotex, id.* at 322–323, 106 S.Ct. 2548; *Sollon, id.;* Fed.R.Civ.P. 56(e). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations, or mere suspicious beliefs. *Liberty Lobby, id.* at 250–252, 106 S.Ct. 2548; *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995).

A court addressing cross-motions for summary judgment considers each motion separately. *Smith v. Prudential Ins. Co. of Am.,* 513 F.Supp.2d 448, 452 (E.D.Pa.2007), *citing Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.,* 10 F.3d 144, 150 (3d Cir.1993). A party's concessions made for purposes of its own summary judgment motion do not carry over into the court's consideration of the opposing party's motion. *Coolsprincr Stone Supply, id.*

## IV. FACTUAL HISTORY[1]

We set out in considerable detail the factual history because in deciding a motion for summary judgment in an

---

1. Unless otherwise stated, the facts in this section are undisputed. References to the record have been omitted except where the

parties disagree about a specific fact or the Court has quoted a document exactly.

ERISA case where the plaintiff claims benefits were improperly denied, a reviewing court is generally limited to the facts known to the plan administrator at the time the decision was made. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007). Moreover, the inquiry as to whether and how far the abuse of discretion standard should be heightened is an extremely fact-intensive exercise and therefore, in order to make this determination, the court must have all the relevant facts set out. *Gibson v. Hartford Life & Accident Ins. Co.*, CA No. 06–3418, 2007 WL 1892486, *3, 2007 U.S. Dist. LEXIS 47337, *8 (E.D. Pa. June 27, 2007).

Elizabeth Lamanna was born, raised, and educated in Pittsburgh, Pennsylvania, where she received a law degree from Duquesne University in 1981. After several years as an assistant district attorney in Pittsburgh, Plaintiff began working as a special agent for the FBI in January 1986. As an FBI employee, she was eligible to elect long term disability insurance coverage through a policy offered by SAMBA[2]

which in turn was insured by Fidelity Security Life Insurance Company ("Fidelity.") At all times relevant to the events herein, Plaintiff was covered under the Plan.

According to a report to one of her physicians, Ms. Lamanna was in good health until July or August 1992 when she began to experience a flu-like illness with aches, pains, fever, sore throat, headaches, and profound fatigue. After a week or so, all the symptoms disappeared except for significant chronic fatigue, muscle achiness, and weakness. Ms. Lamanna consulted a physician who diagnosed her with hypothyroidism[3] and began treating her with thyroid replacement therapy. In October 1993, after she collapsed while jogging, she was admitted to a hospital in Greenwich, Connecticut, for heart palpitations. Doctors there concluded she had been mis-diagnosed and that treatment with thyroid replacement had actually resulted in hyperthyroidism.[4] In addition, they discovered she had a positive test result for Lyme disease[5] which Ms. La-

---

**2.** Membership in the Plan, and in other benefit plans offered by SAMBA, is open to individuals who are active, full-time employees, or retirees from, any United States government agency, including the FBI, "whose mission involves or supports activities to enforce federal laws or to secure the homeland through surveillance, intelligence, counterintelligence and other non-military security activities conducted at home or abroad, and the U.S. Courts." (AR at PLN 1–2.)

**3.** Hypothyroidism is a condition in which the thyroid gland fails to produce enough of certain hormones which control metabolism. Consequently, the body's normal rate of functioning slows, causing mental and physical sluggishness. Hypothyroidism may cause a variety of symptoms and may affect all body functions. See the medical encyclopedia entry at the National Institute of Medicine's online reference website, www.nlm.nih.gov/medlineplus (last visited March 3, 2008), "MedlinePlus." In this instance, as in all others where MedlinePlus or other on-line public sources are cited, the information does

not appear in the administrative record but is provided to assist the reader. See *Kosiba v. Merck & Co.*, 384 F.3d 58, 69 (3d Cir.2004) (A court may use evidence outside the administrative record in order to better understand the medical issues involved.)

**4.** Hyperthyroidism is a condition in which the thyroid gland produces excess amounts of the hormones which control the body's metabolism. See medical encyclopedia entry at MedlinePlus.

**5.** Lyme disease is an inflammatory disease spread through a tick bite and may be objectively diagnosed through blood tests. Early symptoms resemble the flu and include fever, headache, chills, muscle pain, and lethargy. Stiff neck, joint inflammation, body-wide itching, unusual behavior, and other symptoms may be seen in persons with later stages of the disease. It is treated with antibiotics and with anti-inflammatory medications such as ibuprofen to relieve joint stiffness. See medical encyclopedia entry at MedlinePlus.

manna could have contracted from possible exposure to ticks during weapons field training required by the FBI.

In April 1994, Ms. Lamanna consulted with a rheumatologist, Dr. Richard L. Danehower. Dr. Danehower noted by that time, Ms. Lamanna had probably seen as many as fifteen other doctors in an effort to determine the source of her illness. Following a physical examination which he described as "essentially normal," the physician noted:

A search for tender points was essentially negative. Despite the absence of tender points, I think much of what she is describing is in the fibrositis [6] category. Whether this is idiopathic [7] fibrositis or whether this is post Lyme fibrositis I am not sure. Whether [intravenous] antibiotics would help her with this I do not know. My guess is that they would not, but of course if they did, that might offer for her the possibility of permanent cure, which is otherwise not something that I can offer her for idiopathic fibrositis.

(Administrative Record, Docket Nos. 15, 16, and 17, "AR," at 229.)

Plaintiff was also examined in May 1994 by an infectious disease specialist, Dr. Peter C. Welch, who ordered a number of blood tests to rule out Lyme disease. Dr. Welch concluded, "My impression is that she has fatigue and [joint pain], the exact cause of which is not clear. Possibilities include fibromyalgia [or] Lyme disease, with or without fibromyalgia...." (AR 225.)

In July 1994, Dr. Frank Pappalardo, Ms. Lamanna's general practitioner, recom-

---

**6.** Fibrositis is an alternative name for fibromyalgia, a common condition characterized by long-term, body-wide pain and tender points in joints, muscles, tendons, and other soft tissues; it has been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety. Fibromyalgia can develop on its own or along with other musculoskeletal conditions such as rheumatoid arthritis or lupus. The disorder has an increased frequency among women 20 to 50 years old. [Ms. Lamanna was 37 years old in 1992.]

The cause of the disorder is unknown, but proposed etiologies include physical or emotional trauma; abnormal pain transmission responses; sleep disturbances; changes in skeletal muscle metabolism, possibly caused by decreased blood flow; and infectious microbes such as viruses (although at this time, no such virus or microbe has been identified.) The overwhelming characteristic of fibromyalgia is long-standing pain associated with 18 defined "tender points," which are distinct from "trigger points" seen in other pain syndromes. The soft-tissue pain of fibromyalgia is described as deep-aching, radiating, gnawing, shooting or burning, and ranges from mild to severe. Fibromyalgia sufferers tend to wake up with body aches and stiffness. For some patients, pain improves during the day and increases again during the evening, although many patients with fibromyalgia have day-long, unrelenting pain. Pain can increase with activity, cold or damp weather, anxiety, and stress.

Specific symptoms include tender points on the back of the neck, shoulders, chest, rib-cage, lower back, buttocks, thighs, knees, and elbows; fatigue; sleep disturbances; body aches; reduced exercise tolerance; and chronic facial muscle pain or aching. Diagnosis of fibromyalgia requires a history of at least three months of widespread pain, as well as pain and tenderness in at least 11 of the 18 tender-point sites. Laboratory and x-ray tests may be done to confirm the diagnosis, primarily by ruling other conditions with similar symptoms. In mild cases, symptoms may go away when stress is decreased or lifestyle changes are implemented. Treatment may include medications to decrease depression, relax muscles, improve sleep quality and reduce inflammation; physical therapy; psychological and life-style counseling; diet modification; stretching exercises and massage; and, in severe cases, pain management programs. *See* medical encyclopedia entry at MedlinePlus.

**7.** Idiopathic is defined as "arising spontaneously or from an obscure or unknown cause." *See* medical dictionary at MedlinePlus.

mended that she be examined at the Mayo Clinic in Rochester, Minnesota. Between July 25 and July 29, 1994, she was examined by a number of specialists at Mayo who effectively ruled out Lyme disease, continuing thyroid conditions, and other infectious or major rheumatologic disorders. The lead physician concluded, "I suspect this is all fibromyalgia" (AR 210), while other Mayo doctors opined it was "mostly likely" chronic fatigue syndrome ("CFS.")[8] (AR 211, 202.)

Ms. Lamanna returned to Mayo in November 1994 after she began experiencing daily severe headaches with sensitivities to light and noise and memory problems in addition to her chronic fatigue, muscle aches, joint pain, and sleep disturbances. A neurological consultation and CT scan of her head showed no serious neurological condition. Mayo physicians recommended that she continue taking elavil (amitriptyline) which had been prescribed for her headaches and which had the added benefit of alleviating her joint pain. (AR 113, 200–201, 536–537.)[9]

Meanwhile, Ms. Lamanna continued working as a special agent although she complained to her physicians that her supervisor at the FBI rejected the idea that she had a medical illness, implying she had "some type of psychosomatic process which is somehow less legitimate than a medical illness or indeed might even be a malingerer who simply doesn't want to work." (AR 181.) She also reported she had been unable to arrange a reduction in her 12– to 15–hour workdays, high-stress assignments, and long commute. In June 1995, Dr. Pappalardo restricted her from any lifting, pushing or pulling, use of defensive tactics, running, and use of firearms. On October 31, 1995, he noted that Ms. Lamanna planned to return to Mayo again, this time to rule out any psychiatric problems associated with CFS and fibromyalgia.

On November 7, 1995, a physician at Mayo described Ms. Lamanna as pleasant, well-groomed, and talkative, with "somewhat of a somatic focus." Noting that she demonstrated no psychiatric illness and

---

**8.** Chronic fatigue syndrome, also known as immune dysfunction syndrome, is a condition of prolonged and severe fatigue which is not relieved by rest and is not directly caused by other conditions. The exact cause is unknown but viruses such as Epstein–Barr virus or human herpes virus–6 are suspected. It may also be caused by inflammation of pathways in the nervous system which generates a non-specific immune response or process or when a viral illness is complicated by a problem with the body's immune response. To be diagnosed with this condition, the new-onset fatigue must last at least 6 months, not be relieved by bed rest, and be severe enough to restrict the patient's exertion level to 50% or less of her typical exertion levels before the illness. Other medical signs of CFS include mild fever, sore throat, lymph node tenderness, widespread muscle weakness and muscle pain, unrefreshing sleep, headaches, joint pain (often migratory but without swelling or redness), and mental conditions such as forgetfulness, difficulty concentrating, confusion, or irritability. The Centers for Disease Control have identified CFS as a distinct disorder with specific symptoms and physical signs; it is diagnosed by ruling out other possible causes. *See* medical encyclopedia entry at MedlinePlus.

Like fibromyalgia, there is no "dipstick" laboratory test for chronic fatigue syndrome; however, it has been recognized by the Centers for Disease Control since 1988 and the Social Security Administration's internal operations manual lists CFS as a disease to be adjudicated on a case-by-case basis. *Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir.1993).

**9.** As shown by this citation, the administrative record in this case is in a state of disorganization such as this Court has seldom experienced. Most disturbing, medical records were unidentified by source and more than 1,200 pages of materials were in no chronological or topical order, excessively duplicative, and, as discussed in more detail below, appear to be incomplete.

had a "positive adjustment" to her illness, he concluded, "I see no [psychological] reasons she cannot perform her job." (AR 174.) The same day, another physician noted that he doubted depression was a major factor. The next day, a Dr. Reeves performed a physical examination and indicated the location of tender points on a chart, commenting that "by history, [she] clearly has fibromyalgia although currently [she] only has 8 tender points." He also reported he had a long discussion with Ms. Lamanna about her diagnosis, the fact that she was dealing with it well emotionally, and that, according to the Mayo psychology team, she had "no psychiatric issues." (AR 175–176.) Dr. Reeves later concluded, "Aside from the stress of her job, this diagnosis does not confirm any inability for her to do her job.... However, ... her work environment will not allow her to engage in her fibromyalgia treatment program." (AR 182.)

In a letter to Dr. Pappalardo dated December 11, 1995, Dr. Shon E. Meek, head of the treatment team at Mayo, reported that as a result of the general medical evaluation Ms. Lamanna had just undergone, Mayo physicians had concluded "her symptoms were most consistent with fibromyalgia" and she would benefit from physical therapy, stretching exercises, and biofeedback. Dr. Meek specifically noted that Dr. J.C. Bowar of the Department of Psychiatry had concluded she had no psychiatric disorder or depression and had a positive adjustment to her symptoms; he found "no reason she could not perform her job adequately from a psychiatric standpoint." In sum, the Mayo team concluded "her symptoms of fibromyalgia

should not limit her ability to perform her job." (AR 531.)

Despite these reassuring reports, the record indicates that Ms. Lamanna went on unpaid medical leave from the FBI as of February 21, 1996, and applied for LTD benefits. Sometime between February 8 and April 25, 1996, Dr. Pappalardo completed a form referred to as an "Attending Physician's Statement of Disability" in which he indicated Ms. Lamanna had been diagnosed with fibromyalgia and CFS, she was confined to her home, her condition had retrogressed, and she was disabled from her own as well as any other occupation. He further noted that Ms. Lamanna required intensive physiotherapy.[10] (AR 534–535.)

In May 1996, Ms. Lamanna returned to the Mayo Clinic, this time to be evaluated as to her suitability to participate in a pain management program ("PMP.") On May 16, as part of the PMP evaluation, Dr. J.A. Graf noted she was debating whether to resign from the FBI and return to practicing law. He noted a "two-year history of diffuse pain compatible with a diagnosis of fibromyalgia," and further commented:

> She does not present a history of any kind of psychiatric disorder and it is my impression as it was that of Dr. Bowar in 1995 that she is not suffering from any specific psychological disorder. I, myself, do not believe that fibromyalgia is a psychosomatic process, although like any illness it can be exacerbated by stress.... Excellent candidate for a pain management program.

(AR 181.)

According to the terms of the Plan, long term disability benefits were available to

---

**10.** Defendant suggests that Dr. Pappalardo recommended in this report that Ms. Lamanna was in need of "intensive psychotherapy." (Defendant's Statement of Undisputed Facts, Docket No. 20, ¶ 12, *citing* AR 535.) Although we find Dr. Pappalardo's handwriting

somewhat less than completely legible, we conclude he indicated she would require "intensive physiotherapy" based on the fact that the first part of the word is clearly "physio," not "psycho."

participants who could show they were "totally disabled," a term which had two definitions. During the first twenty-four months of coverage (following a 60–day elimination period), a participant was considered totally disabled if she showed she was "completely unable to perform each and every material duty pertaining to [her] occupation with the employer," a period referred to as the "own occupation period." Thereafter, a participant was considered totally disabled only if she was "completely unable to engage in each and every occupation for which [she] is reasonably qualified by education, training or experience," i.e., the "any occupation period." (AR 1, 7.) As of June 12, 1996, Plan administrators determined that Ms. Lamanna was totally disabled due to "fibromyalgian [sic], chronic fatigue, hypothyroid [sic], immune disfunction [sic] syndrome" under the "own occupation" definition and she began receiving benefits retroactively as of April 20, 1996. (AR 539.)

In the letter granting benefits, SAMBA reminded Ms. Lamanna of several relevant provisions of the Plan, including the requirement that she apply for other sources of income available through the Social Security Administration ("SSA") or the Federal Employees Retirement System ("FERS") and that her LTD benefits paid under the Plan would be reduced by the amount of any benefits she received through such programs. She was also advised that periodic medical updates from her treating physician would be required so SAMBA could "better understand the health problems that preclude the resumption of [her] regular work duties." (AR 1191.)

Ms. Lamanna returned to Mayo in mid-June 1996 for pain management education, an intensive program of physical therapy, occupational therapy, stress management, and behavioral therapy. In an interview conducted on June 17, Ms. Lamanna reported that her primary current stress was related to her job, that is, "her employer has not been supportive of previous/current medical recommendations" that she decrease her workload to an eight-hour day, participate in physical therapy three times a week, and be allowed to relocate to an office closer to her home. (AR 160.) On June 18, she underwent a battery of intelligence, learning, memory, academic achievement, and similar tests. The physician evaluating her noted she seemed anxious while completing the tests but concluded the results were "a valid estimate of the patient's overall level of cognitive functioning." He further reported:

> The patient also completed the Symptom Checklist 90–Revised (SCL–90–R) as part of her psychometric evaluation. Overall, the patient's SCL–90–R symptom profile was not of a nature or magnitude considered to be in the clinical range.... General symptomatic distress levels appeared average, suggesting little global psychological distress. Of most importance, the patient's level of somatization appeared at the normative mean [and] was unremarkable.

(AR 163, 140.)

Throughout approximately three weeks of pain management education between June 18 and July 9, 1996, Ms. Lamanna's mood was consistently described as "euthymic" and her affect as "full and responsive." (AR 146–151, 159.) On June 28, 1996, a psychologist noted that her "difficulties with the FBI primarily stem from their nonrecognition of her chronic pain disorder. She states that at the present time the best course of action would appear [to be] to retire on disability and move towards another field of work." (AR 133, 127.) In a dismissal summary dated July 10, 1996, Plaintiff was described as motivated for the PMP,

alert, oriented, pleasant, cooperative and an excellent historian [with] with no objective signs or symptoms of a formal thought disorder or any cognitive deficits. She appears to be of above average intelligence.... Insight and judgment are excellent.... Her known health problems, fibromyalgia and history of hypothyroidism, are stable.

(AR 152.)

Plaintiff's chief problem was identified as "occupational difficulties resulting from lack of support in the work environment." On discharge, her plan was "to return to her work environment with the hope that they will accommodate her request for a modification in her job responsibilities.... If she is unable to continue working in her current position, she may also pursue vocational counseling and assistance." She was also amenable to seeking "continued supportive therapy from a local psychologist." (AR 152–153.)

Throughout late 1996, 1997, and early 1998, Dr. Pappalardo provided regular attending physician reports in which he indicated Plaintiff was totally disabled from both her own and any other occupation. His last note in the administrative record dates from April 27, 1998, when he remarked:

Patient returns today with complaints of fatigue, myalgia and recurrent headaches.... Remains tender in deltoid and supraspinatus area. [Fibromyalgia]

continues, will require pain relief.... Physiotherapy must continue.

(AR 510.)

On July 29, 1998, some three months after Ms. Lamanna entered the "any occupation period" on April 21, 1998, Peter Dwyer, a Fidelity consultant, wrote to SAMBA, stating:

We have completed our review of [Ms. Lamanna's] file. It appears that an IME [independent medical examination] could help in the adjudication of the claim file. However, before an IME can be ordered, we will need several things for the file.... [D]etailed medical records should be obtained from all Doctors/Medical Providers mentioned in the file. I noticed a listing in the file of 21 such sources and I noted that at least 17 should be contacted.

(AR 1167.) [11]

The record reveals that on August 6, 1998, SAMBA wrote to at least 12 doctors as well as the Mayo Clinic, requesting Ms. Lamanna's medical records. Dawn Gunnoe, an insurance benefits specialist at SAMBA, replied to Mr. Dwyer's letter on September 18, 1998, enclosing Ms. Lamanna's file and asking him to give his opinion on her claim. She also noted that while SAMBA had requested medical records from all the physicians Ms. Lamanna had seen in the past, some records had not yet been received but would be forwarded to Mr. Dwyer upon receipt.

As a condition to receiving LTD benefits, Ms. Lamanna had entered into a "Promise to Repay" contract in which she

11. The Court has been unable determine why an "adjudication of the claim file" was initiated since there was no obvious controversy between Plaintiff and Fidelity or SAMBA at this point in time. We assume, therefore, that the word "adjudication" simply refers to a review of Ms. Lamanna's status as she changed from the "own occupation" to the "any occupation" period. On a second point, we have been unable to locate a list identical to that described by Mr. Dwyer. However, AR 97–100 is a list of 21 doctors, 14 of whom have check-marks beside their names. This undated list is written in what appears to be Ms. Lamanna's handwriting, based on the Court's lay comparison to documents known to be written by her.

agreed to apply for any other disability benefits which might be available to her, including, among others, Social Security disability benefits and disability retirement benefits from her employer. In June 1998, Ms. Lamanna had applied for Social Security benefits as required. The application was denied on September 16, 1998, inasmuch as the SSA had concluded her "joint problem, thyroid disorder and tiredness" were not so severe as to preclude her from working. (AR 750–752.) [12]

In his letter of July 29, 1998, Mr. Dwyer had also suggested that SAMBA get an employer's job description and a supplementary statement of education, training and experience from Ms. Lamanna. No job description prepared by the FBI seems to be included in the administrative record, but SAMBA received a list of her "activities and responsibilities" prepared by Ms. Lamanna sometime before November 5, 1998 (AR 285), together with the supplementary statement requested. In describing her daily activities in that document, Plaintiff wrote:

I lead a day to day existence in which I try to take care of my basic needs. Bedridden at times for weeks, months, etc. I must depend *on* others for assistance. The illness for me is cyclical with severe periods of inability, interspersed with my ability to be somewhat ambulatory. There are times I cannot get out of bed or raise my arms to wash my hair. The symptoms wax and wane and new symptoms develop. Uncertainty and unpredictability are the hallmark of my lifestyle. Despite the above symptoms and a host of others too numerous to mention, I maintain a positive outlook and make every effort to be self-sufficient. My focus is on leading a productive life despite my unfortunate medical history.

(AR 284.)

Pursuant to the terms of the Plan, SAMBA or its representative could require a benefits recipient to undergo an independent medical examination on demand. (AR 13, 6.) On January 8, 1999, Dr. Jack J. Berger, a specialist in arthritis and rheumatic diseases and section chief of the department of rheumatology at White Plains Hospital Center in New York, personally examined Plaintiff and reviewed her medical file.

In a letter dated January 11, 1999 (AR 269–271), Dr. Berger first summarized Plaintiff's medical history and her "litany of symptoms." In particular, he commented that although the records from Mayo were "very detailed and comprehensive," they did not "clearly show any definitive evidence that the patient had true trigger point [13] pains that are classic for Fibromyalgia;" even so, she had been diagnosed with this condition and CFS since at least 1996. On physical exam, "palpation of the para-cervical, scapular, lower iliac trigger sites [elicited] a withdrawal re-

---

**12.** This is a curious conclusion by the Social Security Administration. Ms. Lamanna's application for benefits identifies chronic fatigue immune dysfunction syndrome, hypothyroidism, and fibromyalgia as the sources of her disability, not the more generic conditions listed by the SAA. (AR 933–936.) Also, the SSA reached its conclusion based on medical reports by a gynecologist, a specialist in allergies and immunology, and two other medical services not listed among Plaintiff's doctors. The statement is made that "no other reports were available" (AR 752), whereas it is clear that Ms. Lamanna had numerous medical reports from Drs. Pappalardo, Welch, and Danehower as well as the physicians at the Mayo Clinic by this time.

**13.** The Court notes for the record that none of the physicians involved in this case was particular about the language used to describe the painful points, using the terms "trigger points" and "tender points" indiscriminately. As stated above in note 6, "tender points" is the proper term to use when discussing fibromyalgia.

sponse and expression of discomfort," but no significant pain was apparent when he pressed on the trigger points, and there was no "erythema reaction" [14] on the skin at those points. He concluded:

Ms. Lamanna's diagnosis is not readily apparent. She has produced such a list of symptoms, in a manner that makes one believe she has studied all the possible nuances and attributes of Fibromyalgia. However, this is typical of many patients who have been told they have this syndrome—they become very involved in their symptoms and can go into incredibly labored detail about every aspect of their illness. At times one cannot determine when the actual symptoms become more magnified by having repeated their descriptions to so many physicians over many years. Nonetheless, Ms. Lamanna does appear to be incapacitated, if not physically by the sheer range of complaints she presents. For example, her claim that after a bath she has to rest is clearly not a manifestation of Fibromyalgia. It does suggest more of a psychologic problem that needs further evaluation. Her inability to work at the FBI job is apparent, if only by the fact that she cannot manage to go through a day without some issue that she feels is her Fibromyalgia disorder. I am not convinced that Ms. Lamanna suffers from Fibromyalgia, but the problem is that she is convinced, or gives that impression, which, as I stated,

may be the result of so many physicians attributing her non-specific complaints to this diagnosis. Therefore, I do not recommend that she be returned to her previous occupation, which has a high level of demand, and a high stress level. She can however, be considered capable, mentally and physically for non-field related tasks, with an eight hour work day.

. . . .

I do not feel Ms. Lamanna ever had true Fibromyalgia, but convincing her [of] that is probably not likely; she may have partial residual [sic] of Lyme disease, but even with more antibiotic treatment, she will probably not report any improvement in symptoms; she is physically fit for any job, but will probably be incapacitated more by the idea that she has a chronic ailment, and effectively, be disabled from that standpoint. She should have vocational rehabilitation along with psychologic counseling. . . . Her prognosis for full return to work seems doubtful.

(AR 269–271.)

On March 16, 1999, Ms. Gunnoe wrote to Ms. Lamanna, stating that Dr. Berger's report had been received. Because it contained a "suggestion of a psychological overlay to [her] condition," Ms. Gunnoe advised Plaintiff that SAMBA was reserving its right to have her submit to a psychological exam in order to clarify whether she was "being paid appropriately according to the provisions of the policy." [15] Conse-

14. Erythema is defined as "abnormal redness of the skin due to capillary congestion." *See* medical dictionary at MedlinePlus. In fibromyalgia, tender points are not typically accompanied by signs of inflammation, such as redness, swelling, or heat in the joints and soft tissue. Nor in Plaintiff's alternative diagnosis, CFS, is joint pain accompanied by erythema. *See* note 8, *supra.*

15. Although not stated in the letter, Ms. Gunnoe's statements regarding the "psychological overlay" and "being paid appropriately ac-

cording to the provisions of the policy," apparently refer to a provision which, after the initial two years of disability, excludes from coverage "any period of disability or portion thereof, caused by, contributed to, or resulting from a mental, psychoneurotic or personality disorder of the Member [i.e., Plan participant] unless the Member is confined to a Hospital or an institution specializing in the care and treatment of mental, psychoneurotic and personality disorders." (*See* Plan, Section C(6), at AR 8–9.)

quently, while SAMBA would continued to pay the monthly benefits, it was doing so with a reservation of rights. (AR 1141–1142.)

In approximately April or May 1998, Ms. Lamanna had stopped treating with Dr. Pappalardo and began seeing Dr. Kenneth Croen.[16] In an attending physician's statement dated April 19, 1999, he stated that her "muscle fatigue [and] pain make her unable to work reliably" in her own or any other occupation due chronic fatigue, myalgias, and difficulty concentrating. (AR 503–504.)

On May 4, 1999, the Social Security Administration advised Ms. Lamanna that it was again denying her application for disability benefits, based on its review of the materials previously submitted and Dr. Croen's April 19, 1999 report. The SSA concluded that despite her pain and fatigue, Ms. Lamanna could perform other work even though she could not return to her previous occupation. (AR 741–742.) Ms. Lamanna did not seek further review of this decision by an administrative law judge, the next step in the usual appeals process. (See letter of January 18, 2005, from the SSA at AR 739.)

At SAMBA's request, on August 17, 1999, Ms. Lamanna underwent a "semi-structured clinical interview" with Richard P. DeBenedetto, Ph.D. In his report (AR 424–430), Dr. DeBenedetto explained that the purpose of the evaluation was "to establish any causal relationship between the claimant's accident [sic], current psychological status and level of behavioral functioning and to determine the need, if any, for psychological treatment of any causally related psychological symptoms or behavioral dysfunction." (AR 424.) He noted

her physical symptoms (essentially as described elsewhere herein) had been "accompanied by increasing psychological dysfunction," e.g., short-term memory impairment, poor attention and cognitive focusing, "major depression and negative change in personality and behavioral functioning," an inability to perform mathematical functions or remember words, slowed mental processing, and confused organizational and "planful" thinking. However, she denied any psychiatric problems or treatment. (AR 424–425.)

Dr. DeBenedetto's clinical findings noted that Ms. Lamanna displayed no overt symptoms of pain, psychological distress or cognitive dysfunction; her speech was normal and she had no difficulty in articulation. He described her behavior as alert, attuned to task and situational demands, and well within acceptable social limits. She related to him in a "somewhat guarded manner", and was "minimally cooperative," but established "a tense but workable rapport." Her thinking was described as logical, coherent and goal directed, although the content "was notable for a focus on her myriad symptoms and perceived disabilities." Her other mental capacities were unremarkable, as were her mood and affect.

Ms. Lamanna denied symptoms of depression, anxiety, stress-related behavioral dysfunction, sleep disorder or change in personality, stating that her limitations were "due solely to the effects of her physical disabilities" stemming from fibromyalgia. Although she reported short-term memory and attention problems, she stated they did not interfere with her every-

---

**16.** The Court has been unable to pinpoint in the administrative record any medical notes by Dr. Croen prior to the attending physician's statement dated April 19, 1999. The hypothesis that she began treating with Dr. Croen almost a year earlier is based on a statement in the April 19, 1999 report that her first appointment with him was on May 13, 1998. (AR 503.)

day functions, but believed they would likely interfere with her ability to work.

Dr. DeBenedetto administered the MCMI–III psychometric test [17] in order to "identify dominant personality organization and the presence of any significant psychological syndromes or symptom complexes." (AR 427.) He concluded that the test revealed histrionic and narcissistic personality patterns in the "clinically significant range," but no significant elevations in severe personality pathology, clinical syndromes or severe clinical syndromes. Her validity index was elevated in the "desirability scale, suggestive of an avoidant response style" [18] and showed Ms. Lamanna demonstrated deficits in introspectiveness, would try to present herself "as more psychologically integrated and adjusted than [she] may actually be," and, consequently, might tend "to under report psychological dysfunction." (AR 427.)

A second test, the NPSM,[19] revealed, in Dr. DeBenedetto's opinion, an "extensive list of neurological and cognitive deficits . . . highly unusual in the absence of some demonstrable neurological insult," i.e., a "significant brain injury or disease pro-

cess." He concluded that her " 'perceived' cognitive and neurological deficits must remain suspect." [20] (AR 427–428.)

In summary, Dr. DeBenedetto concluded Ms. Lamanna's physical disability had begun "with her perception that she had been mistreated for thyroid disease, moved through a period of perceived mistreatment for Lyme disease, finally resolving itself into a 'presumed' diagnosis of fibromyalgia." He noted, however, that there was "considerable disagreement in the medical record regarding the diagnosis of fibromyalgia as well as questions regarding the psychogenic origin of her reported physical maladies." He further noted a "marked preoccupation" with her illness and symptoms, which in turn raised "a question of somatization and hypochondriasis as well as the suspicion of a possible psychogenic origin to her many physical complaints and related disability." Her psychometric assessment was described as "consistent with a predisposition toward somatic preoccupation and the possible secondary gain which protracted and debilitating illness can confer." He found the history of her illness did not seem consistent with the diagnosis of fibromyal-

17. According to the online encyclopedia, *wikipedia.org*, "the Millon Clinical Multiaxial Inventory–Ill (MCMI–III) is a psychological assessment tool intended to provide information on psychopathology, including specific disorders outlined in the DSM–IV. . . . The test is modeled on four scales: 14 Personality Disorder Scales, 10 Clinical Syndrome Scales, Correction Scales (which help detect inaccurate responding) and 42 Grossman Personality Facet Scales. . . . The major scales are divided in four ranges: normal (0–60), tendency (61–75), trait (76–85), and personality disorder (86–115)." *See* wikipedia entry for Millon Clinical Multiaxial Inventory, last visited February 21, 2008.

18. Histrionic and narcissistic are two of the 14 "personality disorder scales" referred to in the previous note. Correction scales include modifying indices (disclosure, desirability and

debasement) and a validity index. *See* www.pearsonassessments.com/tests/mcmi_3.htm, last visited February 21, 2008. Dr. DeBenedetto did not provide numeric data to support his conclusions about Ms. Lamanna, so we are unable to determine where on the scale the "elevated" or "clinically significant" results may have fallen.

19. The full name and scope of this test are unknown.

20. On the NPSM, Ms. Lamanna indicated she had coordination and balance problems, trouble walking, numbness, forgetfulness regarding routine daily activities (e.g., appointments, the time of day, or names of familiar people), difficulty thinking clearly or quickly, concentrating, understanding directions, etc. (AR 428.)

gia which "is known to have a variable course marked by alternating periods of acute exacerbation and relative remission," while Ms. Lamanna showed "chronic, persistent and unremitting illness." (AR 428–429.)

Dr. DeBenedetto concluded there was "a likely underlying psychogenic component" to Ms. Lamanna's illness, but hastened to add that it was "highly likely that she is quite unaware of the intrapychic [sic] dynamics that give rise to her perception of physical debility and illness." He concluded further that she could not return to any of her former jobs as an FBI agent, prosecutor or litigator, and it was unlikely she would be motivated for any other work, "given her belief that she is physically debilitated by fibromyalgia." Treatment for her condition would typically involve "a number of years of intensive exploratory psychotherapy," but Dr. DeBenedetto opined that Ms. Lamanna was "disinclined to perceive her problems as psychological in origin and [was] opposed to the idea that she may be in need of psychological treatment." (AR 429.) He summarized that given the "questionable diagnosis of fibromyalgia," her "fixed idea" of a physical illness would present significant resistance to psychotherapy, and she would certainly resist a trial of anti-depressant medication "for what may likely be an underlying or masked depression." (AR 430.)

Dr. DeBenedetto's report had no immediate effect on SAMBA's decision-making process regarding continuation of Plaintiff's LTD benefits during the any occupation period. On September 14, 1999, Mr. Dwyer advised Ms. Gunnoe that he was "unable to look over the IME at the present time" because "there were some state audits going on." (AR 1120.) For a few months thereafter, Ms. Gunnoe wrote to

Ms. Lamanna regularly, stating that while SAMBA was reviewing her file, her benefits would continue in order to avoid any hardship to her. (AR 1117, 557, 259.) In November 1999, Mr. Dwyer wrote to SAMBA stating that he had met with Fidelity's attorney about this case and that Fidelity was "in the process of obtaining updated medical. [Sic] Once this is received, we will consider possible [vocational rehabilitation.]" (AR 423.)

Apparently, getting "updated medical" took more than two years. With the exception of a single attending physician's report from Dr. Croen dated July 6, 2000, the next medical notes in the file date from February 2002. Ms. Lamanna apparently began a course of physical therapy under Dr. Croen's supervision at that time, an inference drawn from numerous therapy notes for the period February 2002 through August 2003. In those notes, there are multiple references to treatment for "myofascial trigger points" in the trapezius, interscapular, scapular, suboccipital, scalene, paraspinal, gluteal, post-cervical and rhomboid muscles. (See, e.g., AR 486–487, 494, 497–500.) During the same time period, Dr. Croen noted on November 9, 2002, that Plaintiff was still complaining of chronic myalgias, trigger points in her back, and poor sleep; in February 2003, he repeated his assessment that she was unable to perform either her own or any other occupation. In office notes dated September 11 and October 1, 2003, Dr. Croen noted increased chronic fatigue immune dysfunction symptoms, nausea, severe back pain, and occasional dizziness.

Ms. Lamanna's attorney suggested that she consult Dr. Susan Levine whose speciality is not apparent from the record.[21] In the initial interview on April 15, 2004, Dr. Levine noted Plaintiff's chief com-

21. According to Defendant, Dr. Levine is an allergist and immunologist. (Defendant's

Brief in Support of Motion for Summary Judgment, Docket No. 19, at 10.)

plaints were fatigue, malaise, and muscle pain; she ordered a number of laboratory tests plus MRIs of the brain, cervical and lumbosacral spine and a tilt table test to rule out orthostatic intolerance.[22] In a follow up visit on May 4, 2004, Dr. Levine noted that the blood tests and SPECT scan[23] were consistent with CFS and fibromyalgia; she also identified 16 out of 18 trigger points and noted that Plaintiff had difficulty counting backwards by serial sevens, indicative of concentration lapses. She concluded Ms. Lamanna's chronic fatigue syndrome remained "completely disabling" and that she was "incapable of gainful employment." (AR 444, 447.) She recommended that Plaintiff follow up with Dr. Benjamin H. Natelson, a neurologist, and a Dr. Langdon, a neuropsychologist.[24]

Plaintiff consulted with Dr. Natelson at the New Jersey Medical School's Chronic Fatigue Syndrome and Fibromyalgia Center on July 20, 2004. Ms. Lamanna reported to him that she was experiencing

> severe problems with fatigue, abdominal pain and problems with sleep.... [H]er activity levels are only 30 percent of what they had been prior to her illness onset and ... she is essentially housebound. She reports the following symptoms at substantial, severe, or very severe intensity: headache, myalgia, arthralgia, unrefreshing sleep, and the complaint that even minimal exertion produces a dramatic worsening of her entire symptom complex. She reports having moderate problems with attention and concentration. This symptom complex is consistent with her

fulfilling the 1994 case definition for chronic fatigue syndrome. In addition, review of systems is positive for her having irritable bowel syndrome.

> She reports 4 quadrant pain and on physical examination has 17 of 18 tender points. This is consistent with her fulfilling the case definition for fibromyalgia. On a paper and pencil test for depression, Ms. La Manna [sic] showed no evidence of depression.

(AR 438.)

Dr. Natelson concluded that due to these conditions,

> simply requiring her to report to the workplace would be sufficient to produce symptom worsening that would require her to leave immediately in order to rest. Because of this, I believe Ms. [Lamanna] is 100 percent disabled from her multiple medical diagnoses. I find no evidence of mental illness in this patient.

(AR 439.)

Dr. Croen provided another attending physician's statement on October 20, 2004, noting it was consistent with the reports of October 28, 1998, July 15, 2000, and February 2, 2003, in that Ms. Lamanna's condition was essentially unchanged, she remained disabled from any occupation including her own, and she was not mentally ill. (AR 435–436.)

On November 11, 2004, Emily Stieler, manager of the group plans department at SAMBA, wrote to JHA, Inc. ("JHA"), an external service apparently hired to identi-

---

**22.** In her notes from the initial interview, Dr. Levine also referred to letters from Dr. Pappalardo which purportedly attested to Plaintiff's lack of mental problems and malingering. (AR 865.) Such letters do not appear in the administrative record.

**23.** The first page of the doctor's notes from May 4, 2004, does not appear to be included

in the record, nor has the Court been able to locate the results of the MRIs or SPECT (single photon emission computed tomography) scan.

**24.** If Ms. Lamanna followed up with Dr. Langdon, his records do not appear in the administrative record.

fy independent medical examiners and arrange appointments for Plan participants. She forwarded Ms. Lamanna's file in preparation for another independent medical examination, a review by JHA staff, and a transferable skills analysis. Ms. Stieler asked that Dr. Berger re-evaluate Ms. Lamanna, but if that were not possible, another board certified rheumatologist would suffice.

Dr. James L. Cosgrove, a physical medicine and rehabilitation specialist (not a rheumatologist), examined Ms. Lamanna in January 2005 and performed a document review. In a letter to SAMBA dated January 21, 2005, his summary of Plaintiff's illness from 1992 through 2004 was essentially consistent with the history of this case as the Court has described above.[25] He considered his physical examination largely unremarkable, revealing generalized tenderness and discomfort through the cervical paraspinal muscles, upper trapezius, and shoulder girdle, but "no distinct tender/trigger points." (AR 403.) While she complained of mild discomfort in the thoracic and lumbar spine and in her lower extremities, Plaintiff demonstrated good flexion, extension, and rotation without any distinct tender/trigger points. Dr. Cosgrove concluded:

> . . . . Ms. Lamanna does not meet the criteria for fibromyalgia. . . . She has chronic subjective symptomatology without any objective signs of impairment identified in any of the records that I have reviewed. Based upon my review of the medical records and recent history and physical examination, I would *not* restrict her in her routine daily activities either at work or at home. Consistent

with the comments of Dr. DeBenedetta [sic], I would agree that there appears to be a distinct fixed ideology of illness and infirmity. Indeed, any disability to the extent it exists would be considered iatrogenic [26] or existential in nature. It is my opinion, offered within a reasonable degree of medical certainty, that no harm or injury would occur if Ms. Lamanna returned to regular work and home activities. For completeness, I would appreciate the opportunity to review any diagnostic studies (i.e., MRI or x-ray). If there is any change in my opinions noted above, I will issue an addendum.

(AR 404, emphasis in original.)

On February 10, 2005, Ms. Stieler wrote to Ms. Lamanna, advising her that as of January 30, 2005, her LTD benefits had been terminated in light of the conclusions of the three independent medical examiners that while she might not be able to return to work as an FBI special agent, she was capable of gainful employment such as the practice of law or in related consulting fields. She also advised Ms. Lamanna that this decision was subject to a "full and fair review" under ERISA and that as part of that review, Plaintiff had the right to submit issues and comments in writing within 180 days after she received the letter. (AR 733–735.)

Ms. Lamanna appealed SAMBA's decision in a letter dated July 15, 2005, arguing (1) SAMBA had ignored the objective physical evidence of her illness compiled over 13 years; (2) the doctors who performed the IMEs were unqualified for a

---

**25.** One inconsistency is that Dr. Cosgrove indicated Dr. Natelson had seen Ms. Lamanna both on July 20 and August 17, 2004. (AR 401.) While Dr. Natelson's opinion letter is dated August 17, 2004, the Court has been unable to identify any medical records from that date. Thus, it is unclear if the administra-

tive record is incomplete or if Dr. Cosgrove was merely mistaken about this point.

**26.** Iatrogenic is defined as "induced inadvertently by a physician or surgeon or by medical treatment or diagnostic procedures." *See* dictionary entry at MedlinePlus.

variety of reasons; and (3) in clear disregard of the medical record, SAMBA attempted to characterize her illnesses as psychiatric disorders. (AR 705–708.) In response, SAMBA contacted JHA again, asking that a medical consultation be scheduled with "a medical doctor who is qualified to address the Mental and Nervous Impairments as well as the Physical Impairments of [Ms. Lamanna]." The letter also asked that the chosen doctor consult as necessary with Dr. Cosgrove or any of the other medical doctors about their conclusions. (AR 701.)

In an undated e-mail from Evelyn Screen, a long term disability examiner with SAMBA, to JHA, Ms. Screen indicated SAMBA was ready to proceed with the IME by either an occupational therapist or a rehabilitation specialist. However, numerous medical records from 2002 were missing from Plaintiff's file; Ms. Screen inquired if they should wait for these records. An undated telephone message in response indicated that "JHA is in agreement that waiting for the 2002 records will not impact the overall review." (AR 766–767.)

By August 18, 2005, Dr. Dianna Neal had been selected to perform the IME,[27] and advised (incorrectly) that Ms. Lamanna's diagnoses were depression, CFS and irritable bowel syndrome. (AR 695.) On August 31, 2005, Dr. Neal provided her written report, first noting without explanation that it was "not feasible to personally evaluate" Ms. Lamanna and, consequently, her comments were based strictly on the medical notes available to her. After summarizing the medical records she had reviewed,[28] she confirmed Dr. Cosgrove's opinion that Ms. Lamanna could perform other work suitable to her education and training. Dr. Neal concluded:

[i]t is my opinion that the information present does not support the diagnosis of CFS or Fibromyalgia as the cause of [Ms. Lamanna's] multiple symptoms. Both the absence of medical records in addition to limited objective data, by her attending physicians, including documentation of physical exam findings on most visits, makes it impossible to support the diagnoses. Further, there is consensus among Drs. Berger and Cosgrove who performed IMEs, as well as Dr. DeBenedetto ... all of which appear thorough to include complete objective data [sic], which doubt the diagnosis of Fibromyalgia and CFS and suspect psychological etiology. With this said, it is my opinion that [Plaintiff's] multiple symptoms, many of which are likely related to psychological disease[,] limit her ability to perform the duties of her previously physically and mentally demanding occupation. However, it is my opinion, that [Ms. Lamanna] is capable of working in at least a sedentary to light capacity, as her reported activities would at least be described at that level of function.

(AR 46–47.)

On September 6, 2005, Ms. Screen wrote a note to the file, indicating, without further elaboration, that she was "in agreement with Dr. Neal's conclusion that [Ms. Lamanna] should be capable of functioning within at least a sedentary to light capacity." She further noted that although Dr.

---

27. There is no evidence Dr. Neal was qualified to address Ms. Lamanna's "mental and nervous impairments" nor was she an occupational therapist or rehabilitation specialist. *See* her curriculum vitae at AR 638–642, indicating her area of specialization was family medicine.

28. Although Dr. Neal's report is quite detailed, the Court has given little weight to her opinion in light of the fact that it was issued after the February 10, 2005 termination letter and there is no evidence of how her report was subsequently used by SAMBA.

Neal had questioned the absence of the records from 1992 through 1994 which presumably could have included reference to the criteria used to establish the diagnoses of CFS and fibromyalgia, she believed that even if Ms. Lamanna furnished those records, "it would not change the fact that she exhibits a level of function within at least the sedentary to light classification at this time." (AR 422.) On September 30, 2005, the executive director of SAMBA, Walter E. Sullivan, issued a final denial letter, affirming the earlier termination of benefits.[29]

## V. REVIEW OF BENEFIT DECISIONS COVERED BY ERISA

■ ERISA permits a participant or beneficiary of an insurance plan covered by ERISA to bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In those cases where a court is called upon to determine if the administrator of a benefits plan covered by ERISA has properly interpreted and applied the provisions of the plan, the first matter to be considered is the appropriate degree of scrutiny the court should apply to the administrator's decisions.

■ As the United States Court of Appeals for the Third Circuit pointed out in *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997), ERISA itself does not establish the standard of review for an action brought under § 1132(a)(1)(B). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If, however, the plan does provide the administrator with discretionary authority, the standard of review is more deferential. *Firestone, id.* at 111. This deference applies not only to decisions concerning interpretation of the plan itself, but also to the administrator's fact-based determinations. *Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1187 (3d Cir.1991); *see also Mitchell*, 113 F.3d at 438 (where fact based determinations concerned the administration, interpretation, and application of an LTD plan and the administrator's decisions on those questions were to be "final and binding," the plan clearly provided that such determinations were to be afforded deference.)

■ While some circuits refer to an "abuse of discretion" standard, the Third Circuit has adopted the phrase "arbitrary and capricious" to describe this standard of review. Ordinarily, under such a deferential standard, this Court may not substitute its own judgment for that of the administrator and may overturn a plan administrator's decision "only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993) (internal quotation omitted); *Mitchell*, 113 F.3d at 439. In short, "when the arbitrary and capricious standard applies, the decisionmaker's determination to deny benefits must be upheld unless it was clear error or not rational." *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1141 (3d Cir.1993) (internal quotation omitted.)

---

**29.** This letter does not appear in the administrative record nor is it provided by either of the parties.

However, in *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000), the Court of Appeals clarified that the scrutiny a reviewing court gives to the plan administrator's decisions is to be modified according to a "sliding scale" if the court discerns conflicts of interest which may have tainted the decision-making process. That is, the greater the degree of discernable conflict in the decision-making process, the greater the level of scrutiny the court should apply. *Id.* at 379. This sliding scale approach assists a reviewing court in making "a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion." *Post*, 501 F.3d at 162. In determining where on the arbitrary and capricious scale to situate its review, the district court is directed to "examine each case on its facts." *Pinto, id.* at 392.

More recently, the Court of Appeals emphasized that the sliding scale approach requires consideration of both structural and procedural factors. "The structural inquiry focuses on financial incentives to deny claims while the procedural inquiry focuses on how the administrator treated the particular claimant." *Tylwalk v. Prudential Ins. Co.*, 257 Fed.Appx. 568, 571, 2007 WL 4335671 (3d Cir.2007), *citing Pinto*, 214 F.3d at 392–393. We turn first to the analysis of the structural factors.

A. *Structural Factors*

Structural anomalies arise primarily from conflicts of interest in the administration, interpretation, and funding of the benefits plan. Where the administrator "has a non-trivial financial incentive to act against the interests of the beneficiaries," this conflict alone is sufficient to heighten the court's review. *Post*, 501 F.3d at 162, *citing Pinto*, 214 F.3d at 389–390. The *Pinto* Court identified three common relationships between the employer and the party making benefit decisions:

1. the employer funds the plan and pays an independent third party to interpret it and make benefits determinations;

2. the employer establishes the plan, ensures its liquidity, and creates an internal benefits committee charged with interpreting and administering the plan; or

3. the employer pays an independent insurance company to fund, interpret and administer the plan.

*Pinto, id.* at 383.

Although the first two arrangements typically do not create a conflict of interest, the third "generally presents a conflict and thus invites a heightened standard of review." *Pinto, id.* The reasoning behind this conclusion is that the independent insurance company has a strong financial incentive to deny claims because its profit consists largely of the difference between the amount paid by the employer for its services less the amounts paid out in benefits. Another arrangement that raises particular concern is a plan funded on a case-by-case basis out of the administrator's operating budget rather than from segregated monies that the employer sets aside specifically to pay benefits. *Post*, 501 F.3d at 163, *citing Skretvedt v. E.I. Dupont & de Nemours Co.*, 268 F.3d 167, 174 (3d Cir.2001). By comparison, where the employer both funds and administers the plan, but pays benefits from a segregated trust fund, no structural conflict is created. *Post, id.* at 164, n. 6, *citing Vitale v. Latrobe Area Hospital*, 420 F.3d 278, 282 (3d Cir.2005), and *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley*, 248 F.3d 206, 217–218 (3d Cir.2001).

Here, the parties do not dispute the fact that the Plan now in effect provides SAMBA with the "right to exercise, in a

uniform and nondiscriminatory manner, discretion in the Plan's operation and administration." (*See* SAMBA Restated Bylaws and Plan Instrument, as Restated January 30, 2007, ¶ 11.03, PLN 9.) Moreover, SAMBA has the right to determine eligibility for participation, coverage, and receipt of benefits and to determine whether "objective criteria specifically stated in the Plan have been satisfied for any Plan term, condition, limit or waiver." (*Id.*) Therefore, given the extent of discretion provided to SAMBA, this Court should apply a normal arbitrary and capricious standard of review, considering only if the decision to terminate Ms. Lamanna's LTD benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *See Abnathya, supra.*

SAMBA argues that only a straight arbitrary and capricious review should apply because it is organized as a tax-exempt, not-for-profit corporation which has created a grantor trust from which it pays benefits to members, premiums for insurance for such benefits where applicable, and reasonable administrative expenses related to the Plan. (Defendant's Statement of Undisputed Facts, Docket No. 20, "Def.'s Facts," ¶¶ 2–3.) The trust is funded with member contributions. (*Id.*, ¶ 4.) Thus, there is no financial conflict on SAMBA's part which would give rise to heightened scrutiny. (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 19, at 14–15.)

Plaintiff, conversely, argues that "similar to the plan administrator in *Pinto*, SAMBA is an outside insurer that makes claims decisions itself," the type of structure the *Pinto* court determined gives rise to heightened scrutiny. (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 22, "Plf.'s Brief," at 7.) She further contends it would be in SAMBA's best interest to deny her claim for benefits because payment of those benefits "would be directly reflected in SAMBA's economic bottom-line." (*Id.* at 8.)

In reality, it appears the SAMBA situation is somewhat different from any of those identified in *Pinto* or by the parties herein. That is, the FBI, Plaintiff's former employer, is not the plan sponsor, administrator or funding source. There is no evidence to refute SAMBA's contention that it is a not-for-profit corporation whose sole purpose is to offer a wide range of benefit programs to active and certain retired employees of various federal law enforcement agencies, including the FBI, a status other courts have repeatedly recognized. *See, e.g., Myers v. United States,* 767 F.2d 1072, 1073 (4th Cir.1985); *Finley v. Special Agents Mut. Benefit Ass'n,* 957 F.2d 617, 618 (8th Cir.1992); *Fox v. Special Agents Mut. Benefit Ass'n,* CA No. 05–755, 2006 WL 3613308, \*1, 2006 U.S. Dist. LEXIS 74487, \*3 (S.D.Ind. Sept. 19, 2006). In the case of long-term disability coverage, benefits for participants are paid from monies contributed by the voluntary participants to the SAMBA trust fund. Therefore, denying a claim for benefits serves the interests of the other plan participants by safeguarding the reserves but does not result in a profit to SAMBA. (Def.'s Facts, Exhibit A, Declaration of Walter E. Wilson, Executive Director of SAMBA, "Wilson Decl.," ¶¶ 4–8.)

However, we question whether the SAMBA structure now in effect was the same as when Ms. Lamanna was originally awarded LTD benefits in April 1996 and when they were terminated in February 2005. Prior to September 1, 2005, SAMBA was not the claims fiduciary, but rather took on that role from Fidelity only as a result of a reserve and liability transfer as of that date. (Def.'s Facts, ¶ 46; *see also* AR 647.) Plaintiff's claim was "under SAMBA's L–1 disability policy . . . issued and underwritten by Fidelity Security Life

Insurance Company" (AR 648) and the LTD benefits she "originally received were paid through an insurance policy SAMBA purchased from Fidelity Security Life Insurance Company." (Wilson Decl., ¶ 4.)

Furthermore, the September 1, 2005 notice states:

> This Statement of Coverage page is being issued to confirm that effective September 1, 2005, SAMBA *has assumed* liability for claims that had been incurred under the FSL LD–1 policy and *has become* the claims fiduciary for purposes of that coverage. SAMBA *is vested* with all legal discretion to interpret the plan and make eligibility and benefit determinations.

(AR 665, emphasis added.) Had SAMBA previously been liable for claims under the Fidelity policy, had acted as the claims fiduciary, and had been vested with discretion to interpret the Plan, this language would not have been necessary.

The conclusion that benefits were paid by Fidelity is further supported by the Promise to Repay agreement which Ms. Lamanna signed on May 2, 1996, as a condition for receiving LTD benefits. In that agreement, the following statements are made:

· SAMBA members are covered under a group policy issued by Fidelity;

· Fidelity agrees to pay an entitled Plan participant the LTD benefits;

· If the participant receives any benefits payable from alternative sources, the amount payable by Fidelity will be offset by the amount of those benefits and the claimant will "immediately repay Fidelity Security Life Insurance Company any such sums that have been awarded under any of the above benefit programs;" and

· The participant authorizes her employer to furnish Fidelity "with information necessary to compute [the] LTD benefit under the Policy."

(AR 1198.)

Moreover, it is clear from the record that Fidelity was responsible for receiving written claims for benefits and for making benefit determinations. For example, a letter dated October 20, 2004, from SAMBA to Scott M. Riemer, Plaintiff's former attorney, states that SAMBA had forwarded his letters to Fidelity "for their review and decision as the ERISA claims fiduciary" (AR 819), and a form entitled "Authorization for Release of Information" states that medical providers should furnish their records to Fidelity "for the purpose of evaluating and administrating [sic] claims for benefits" (AR 1166.) Further support for the conclusion that Fidelity, not SAMBA, was the ultimate decision-maker with regard to benefits is found in a letter dated November 24, 2004, from Michael L. Short, Legal Counsel for Fidelity, to Mr. Riemer, in which he described Fidelity as the "claim fiduciary;" states that the Group LTD Insurance Policy issued to SAMBA provided the LTD monthly benefit; and reiterated that the Promise to Repay agreement required Ms. Lamanna to apply for certain other disability benefits and to "immediately repay [Fidelity] any benefits awarded in response to those claims." (AR 788–792.) Fidelity further explained that it was "affirming" SAMBA's initial decision to recoup benefits Ms. Lamanna had received through the FBI's disability retirement program.[30] If the funds were

---

30. In April 1999, as required by the Promise to Repay agreement, Ms. Lamanna had applied for disability retirement benefits from the FBI, payable through FERS as long as she was disabled from "useful service" as an FBI agent, even with reasonable accommodation.

(AR 919–920.) As Defendant points out, from 1999 until late 2004 "there was a substantial amount of correspondence between SAMBA and Lamanna" concerning her actual date of retirement versus the date on which her retirement annuity became effective; Ms. La-

repaid not to SAMBA but to Fidelity, and if Fidelity had the right to affirm (or, presumably, overrule) a benefits decision made by SAMBA, then it appears the insurance company paid the benefits itself, not the SAMBA trust fund.

Finally, the letter of February 10, 2005, from SAMBA terminating Ms. Lamanna's benefits ("the termination letter") outlined the procedures which would be followed if she objected to that decision. Once she had made a formal written request for review and submitted her issues and comments in writing, "SAMBA will forward your review request to Fidelity [and] Fidelity will make a decision upon review within 45 days after the receipt of your request." (AR 735.)

We find the facts of this case similar to those of *Petroff v. Verizon N., Inc.*, CA No. 02–318, 2004 WL 1047896, 2004 U.S. Dist. LEXIS 8138 (W.D.Pa. May 4, 2004). There, the plan document provided that the employer's in-house claims review committee had final authority to construe the terms of the plan and determine eligibility for benefits. However, the court's review of the administrative record revealed "carte blanche reliance on [the insurer's] recommendations at every stage of the review process" and a claims committee which "functioned as a rubber stamp" for the insurer's decisions. The court held that because the insurer had a financial interest in the outcome of the benefits determination, "was intimately involved in a substantive way in the final benefits determination," and because the committee completely deferred to the insurer, the same concerns which triggered a heightened standard of review in *Pinto* were

applicable in that case. *Id.* at 2004 WL 1047896, *11, 2004 U.S. Dist. LEXIS 8138, *30–31.

Based on similar evidence in this matter, we conclude that when (1) the initial decision to grant Ms. Lamanna LTD benefits, (2) the decisions to require independent medical examinations, and (3) the February 10, 2005 decision to terminate benefits were made, SAMBA was in the shoes of the "employer" who had hired an independent insurance company to fund, interpret and administer the LTD plan, the precise situation which raised the level of scrutiny in *Pinto*. Therefore, the Court will apply a moderately heightened level of scrutiny based on the relationship between SAMBA and Fidelity at the time the relevant decisions were made.

■ *Pinto* and its progeny have identified other structural matters which the court should review, one of which is the relative sophistication of the parties. *Id.*, 214 F.3d at 392. However, the expected differences in sophistication between an insurer and a claimant do not, standing alone, raise much suspicion. *Rendulic v. Kaiser Aluminum & Chem. Corp.*, 166 F.Supp.2d 326, 337 (W.D.Pa.2001). Although this point is not addressed by the parties, the Court concludes Plaintiff is not the typical unsophisticated plan participant; to the contrary, she is a well-educated lawyer who did not hesitate to question the policies and procedures related to her LTD coverage. On the other hand, she is not, apparently, versed in ERISA or labor law, having spent most of her career in criminal prosecution. At least one court has found the claimant-attorney's lack of

manna's unilateral decision to return to FERS certain lump-sum payments made in 1999 and 2000; and the SAMBA decision to withhold her monthly LTD benefits in order to recoup that portion of previously-paid LTD benefits which should have been offset by the FERS payments. When Ms. Lamanna's LTD benefits were terminated as of January 30, 2005, according to Fidelity, there was a remaining balance to be repaid of $25,867.60. (AR 17.) The parties agree that no questions regarding this issue are before the Court and we do not address it further.

sophistication in ERISA, labor law or medicine a factor to be considered in determining its level of scrutiny. *See Cohen v. Std. Ins. Co.*, 155 F.Supp.2d 346, 353 (E.D.Pa. 2001). Moreover, although Ms. Lamanna handled her claim during the own occupation period, she later had legal assistance. *See Lightner v. Liberty Life Assur. Co.*, CA No. 04–2334, 2006 WL 860080, *11, 2006 U.S. Dist. LEXIS 20035, *34, (M.D.Pa. Mar. 31, 2006) (where claimant had legal representation after benefits were denied, the parties were equally sophisticated.)

The *Pinto* Court also identified disparities in the information accessible to each party as a structural factor to be considered. It is clear from the administrative record that Ms. Lamanna and her attorneys could ask for and receive copies of her file, the IME reports, and the Plan documentation. (*See*, e.g. AR 682.) Thus, this factor would not normally raise the level of scrutiny the Court would apply. However, the U.S. District Court for the Eastern District of Pennsylvania slightly increased its level of scrutiny when physicians' reports on which the insurer relied were submitted less than two weeks before the decision to deny benefits and there was no evidence that the plaintiff had been able to review those documents before the decision was made. *Kaelin v. Tenet Emple. Ben. Plan*, 405 F.Supp.2d 562, 575 (E.D.Pa.2005). Here, Ms. Lamanna underwent the IME by Dr. Cosgrove on January 8, 2005, his report was dated January 21, and in the termination letter SAMBA stated that it was relying on that report, a copy of which was enclosed. (AR 733–734.) The Court infers from the last statement that Plaintiff had not previously received his report. Thus, like the plaintiff in *Kaelin*, Ms. Lamanna had no opportunity to review the document on which SAMBA relied prior to the decision to terminate benefits, and the Court will

slightly raise its level of scrutiny for that reason.

### B. *Procedural Irregularities*

In addition recognizing structural problems, the Third Circuit Court of Appeals has held that reviewing courts should "look not only at the result—whether it is supported by reason—but at the process by which the result was achieved." *Pinto*, 214 F.3d at 393. "Demonstrated procedural irregularity, bias or unfairness in the review" of a claimant's application for benefits will also result in a heightened level of scrutiny. *Kosiba v. Merck & Co.*, 384 F.3d 58, 66 (3d Cir.2004), *cert. denied*, 544 U.S. 1044, 125 S.Ct. 2252, 161 L.Ed.2d 1079 (2005). The *Pinto* court identified three such procedural anomalies: "(1) the insurer's reversal of its original determination without the examination of additional evidence; (2) a self-serving selectivity in the use of evidence; and (3) a bias in decision-making to the benefit of the insurer." *Russell v. Paul Revere Life Ins. Co.*, 148 F.Supp.2d 392, 406 (D.Del.2001), interpreting *Pinto*. Other examples include reliance on the opinions of non-treating physicians over those of treating physicians without explanation (*Kosiba, id.*); failure to follow the plan's notification provisions or reliance on self-serving paper reviews of medical files (*Lemaire v. Hartford Life & Accident Ins. Co.*, 69 Fed.Appx. 88, 92–93 (3d Cir.2003)); reliance on inadequate information or incomplete investigations (*Friess v. Reliance Std. Life Ins. Co.*, 122 F.Supp.2d 566, 574–575 (E.D.Pa.2000)); subsequent disregard of opinions previously relied upon and/or selective use of those opinions (*Tylwalk*, 257 Fed.Appx. at 571–72); and an inattentive or biased review process evidenced by the failure to seriously consider a treating physician's conclusions or cursory analysis of medical reports (*McGuigan v. Reliance Std. Life Ins. Co.*, CA No. 02–7691, 2003 WL 22283831,

*5–6, 2003 U.S. Dist. LEXIS 17593, *16–17 (E.D.Pa. Oct. 6, 2003).) The burden is on the plaintiff to prove procedural bias. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 435–436 (3d Cir.2001) (heightened arbitrary and capricious review is required when "the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case.")

Ms. Lamanna argues that bias in the review of medical documentation is the most egregious procedural anomaly, particularly the fact that in the February 10, 2005 termination letter, SAMBA relied "exclusively" on the reports prepared by Drs. Berger, DeBenedetto and Cosgrove (each of whom had examined her on only one occasion and only at the behest of SAMBA) while failing to refer "by name or implication" to any of her treating physicians' diagnoses for the previous 12 years. Plaintiff regards this "blatant procedural bias" as "stunning indeed." (Plf.'s Brief at 15–16.) In its response, SAMBA contends that Plaintiff has repeatedly misstated the record. (Defendant's ... Memorandum of Law in Opposition to [Plaintiff's Brief], Doc. No. 24, "Def.'s Opp.," at 3.) Defendant argues, for example, that contrary to Plaintiff's position, Dr. Cosgrove did not ignore Dr. Natelson's findings, but specifically discussed his conclusions and disagreed with them. Similarly, SAMBA did not fail to refer to Plaintiff's treating physicians in the termination letter but clearly stated it had reviewed "all documentation provided to date in relation to your disability, including the medical information received from your providers." (*Id., citing* AR 734.)

■ As will be discussed in the next section, the Court agrees with Plaintiff that there are numerous procedural inconsistencies which demonstrate reliance on medical reviews based on incomplete records, failure to adequately analyze the reports of Plaintiff's treating physicians, and

unrealistic demands for objective evidence of fibromyalgia and chronic fatigue syndrome. Contrary to Plaintiff's description, however, we find none of these anomalies individually rises to the level of "blatant" procedural bias. Rather, we conclude that the cumulative weight of the structural conflicts discussed above, together with numerous procedural irregularities, requires the Court to apply a moderately heightened level of scrutiny in considering the decision to determinate Ms. Lamanna's LTD benefits. *See Pinto*, 214 F.3d at 393 (where moderately heightened arbitrary and capricious review is warranted, the court should be "deferential, but not absolutely deferential.")

## VI. PROCEDURAL IRREGULARITIES IN THE DECISION MAKING PROCESS

A comprehensive review of the medical evidence in this case exposes an inexplicable chasm between the opinions of Plaintiff's own physicians and those who performed IMEs at SAMBA's request. On one side are Drs. Pappalardo and Croen, Plaintiff's long-term treating physicians, together with the physicians at the Mayo Clinic who examined her on five occasions between 1994 and 1996, two consulting physicians from 1994, Drs. Danehower and Welch, and two consulting physicians from 2004, Drs. Levine and Natelson. Without exception, these physicians agreed Ms. Lamanna was suffering from fibromyalgia, chronic fatigue syndrome, or both. Drs. Pappalardo, Croen, Levine and Natelson all concluded she was incapable of returning to either her own or any other occupation. On the other hand, the Mayo Clinic physicians concluded in December 1995 she was physically and mentally capable of returning to her work as an FBI special agent, while Drs. Danehower and Welch expressed no opinion on this question. In medical notes covering more than

10 years, none of Plaintiff's physicians expressed any concern about excessive somatization, hypochondria, or malingering. In fact, in the objective psychological testing reported by Mayo Clinic in June 1996, the examining psychologist found that her "general symptomatic distress levels appeared average, suggesting little global psychological distress" and "of most importance," [Ms. Lamanna's] "level of somatization appeared at the normative mean [and] was unremarkable." (AR 140.)

On the other side of the chasm stand Drs. Berger, DeBenedetto, and Cosgrove, each of whom examined Ms. Lamanna on a single occasion and reviewed at least some of her medical records. All of them concluded Ms. Lamanna probably did not have true fibromyalgia, there was a strong psychosomatic element or origin to her symptoms, and she was not disabled from performing some sort of gainful activity, even if she could not return to work as an FBI agent.

■ Before considering how Fidelity and SAMBA interpreted these conflicting opinions, we note as a threshold matter that a plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians than to those of independent medical examiners. In *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 829–830, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), the Supreme Court explicitly distinguished ERISA disability cases from Social Security disability claims in which the opinions of treating physicians are given great, if not controlling, weight on matters regarding the severity of a claimant's disability, even though, as the Court acknowledged, in many cases, treating physicians have a better opportunity to know and observe the patient over a period of time as compared to one-time consultants. At the same time, *Black & Decker* did not hold that treating physicians' opinions are *never*

entitled to deference over retained consultants' opinions, only that administrators are not required "automatically to accord special weight to the opinions of a claimant's physician." *Id.* at 834, 123 S.Ct. 1965. The administrator's weighing of the opinions should consider the length of the relationship between claimant and physician and whether any of the physicians in question are specialists in the relevant medical discipline. *Id.* at 832, 123 S.Ct. 1965. Conversely, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834, 123 S.Ct. 1965; *see also Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 258 (3d Cir.2004) (the plan administrator's decision to terminate benefits was not arbitrary and capricious where there was simply a "professional disagreement" between the claimant's doctor and the defendant's consulting physicians.)

Keeping this guideline in mind, we conclude, however, that there were significant omissions, mis-interpretations, and unreasonable expectations in the reports of the medical consultants upon which SAMBA relied in reaching its conclusion that Ms. Lamanna could perform other work such as the practice of law. Consequently we find this decision was not based on substantial evidence. We address each of the procedural errors in turn.

A. *The Record Reviews by the Independent Examiners Were Based on Incomplete Information*

When Dr. Neal performed her records review in August 2005, she was the first of the four independent examiners to recognize a very important fact: the file did not include Ms. Lamanna's medical records for the period 1992 (when she experienced the first episodes of a "flu-like" illness) through April 1994 when Dr. Danehower

concluded she probably had idiopathic fibromyalgia or chronic fatigue syndrome. Dr. Danehower further noted that when he examined Ms. Lamanna, she had seen "probably" fifteen other doctors since 1992, but none of their records were included in the SAMBA file. Drs. Berger, DeBenedetto and Cosgrove all commented that the medical evidence did not include a definitive diagnosis of fibromyalgia and hypothesized Ms. Lamanna was convinced she had the condition only because doctors had repeatedly told her she did; none of them apparently considered that at some time prior to 1994, a doctor had made the diagnosis correctly, but the records were missing. Dr. DeBenedetto's references to Ms. Lamanna's "perception" that she had been mistreated for Lyme disease and her "presumed" diagnosis of fibromyalgia are particularly curious, given that he had no medical records to support these characterizations. There is no evidence that Ms. Lamanna was ever asked to provide earlier records but failed to do so.

In addition, although the independent medical examiners each listed in their reports the records they reviewed, there are some glaring omissions. For instance, Dr. Berger did not indicate he reviewed any of Dr. Pappalardo's or Dr. Croen's notes [31] or Mayo Clinic notes from November 1994, November 1995, and November 1996. Similarly, Dr. DeBenedetto's review is significant for the absence of references to Dr. Pappalardo's office notes, Dr. Danehower's consulting report, Dr. Croen's notes for the period May 1998 through August 1999, and Mayo Clinic notes from July 1994, November 1994, November 1995, and November 1996. Dr. DeBenedetto did consider Ms. Lamanna's job description along with some medical records, i.e., the 1996 notes from the Mayo pain

management program; Dr. Welch's notes from his May 1994 infectious disease consultation; an allergy and immunology treatment report from February 1994; and "various culture and blood studies" from 1994 through 1997. However, the only medical information to which Dr. DeBenedetto explicitly referred is Dr. Berger's January 1999 report. Most significantly, he did not explain how he came to such divergent conclusions from those of the Mayo psychologists who found no significant psychiatric component to Ms. Lamanna's fibromyalgia or chronic fatigue syndrome. (*See* AR 426.) Dr. Cosgrove's report is considerably more thorough, summarizing the medical records beginning with Dr. Pappalardo's notes from May 1994 and concluding with Dr. Croen's notes from 2004, plus the consultative reports by Drs. Natelson and Levine. However, as discussed in the next section, with the exception of Dr. Croen's notes and the physical therapy reports, he reviewed no medical records for the period 2000 through April 2004.

Defendant analogizes this case to that of *Corry v. Liberty Life Assur. Co.*, 499 F.3d 389 (5th Cir.2007). (Def.'s Opp. at 8.) As here, three independent medical examiners concluded the plaintiff could perform other work, despite evidence from her own medical providers that she could not. The court held that the administrator had not acted arbitrarily or capriciously by accepting the IMEs' decision over that of the claimant's physicians. *Id.* at 403. However, we find numerous significant factual differences between *Corry* and this case. For instance:

· In *Corry*, the insurer actively investigated and evaluated the claim for more than two years while continuing to pay

---

**31.** One minor exception in this regard is a reference to medications which had been pre-

scribed by Dr. Croen. (AR 270.)

benefits; here, no action at all was taken with regard to Ms. Lamanna's claim between Dr. DeBenedetto's IME in August 1999 and that of Dr. Cosgrove in January 2005;[32]

· Unlike Corry's situation, Ms. Lamanna's treating physicians were apparently never asked to complete factual questionnaires concerning objective medical evidence and her subjective symptoms;

· In this case, there was no attempt to perform a functional capacity examination, much less a refusal by the claimant to undergo such a test as there was in *Corry*;

· Ms. Lamanna never refused to undergo an independent neuropsychological examination as did Corry;

· There was no attempt in this case to use medical evidence together with an objective labor market study regarding the availability of jobs which fit the claimant's experience and qualifications to support the insurer's conclusion that there was other work available which she could perform; and

· The record in *Corry* showed that the insurer and its physicians considered all evidence of disability which the claimant submitted, including her subjective complaints of pain and disability, unlike the IMEs here who rejected out of hand Ms. Lamanna's subjective complaints as "somatization" and con-

cluded there was a "psychogenic origin to her many physical complaints."

*See Corry, id.* at 403.

We find this case similar to *Patton v. Cont'l Cas. Co.*, CA No. 04–0220, 2005 WL 736595, 2005 U.S. Dist. LEXIS 5463 (E.D.Pa. Mar. 31, 2005), in which a consulting physician received multiple medical records indicating the plaintiff's significant limitations affecting her ability to work. The court found that the insurer's reliance on the consultant's report was arbitrary and capricious because he had failed to perform a "discerning review," i.e., he did not have complete medical records, did not discuss the treating doctors' findings, did not explain why he discarded or discounted them, and "glossed over" well-supported medical opinions with which he disagreed. *Id.* at 2005 WL 736595, *12, 2005 U.S. Dist. LEXIS 5463, *35–36.

■ It would be unrealistic to require an independent medical examiner to identify and evaluate every piece of evidence in a claimant's file, particularly when the history of the case extends, as it does here, over numerous years. However, where the decision maker is relying on that examiner's interpretation of the medical record as one of the two reasons to deny benefits (the other being the consultant's own findings on examination), and where the opinions of the claimant's treating physicians and the consultant are as divergent as they are here, the decision to deny benefits must be considered arbitrary and capricious when the examiner provides no

---

**32.** In the termination letter of February 10, 2005, SAMBA stated its focus had been "diverted"—apparently for almost six years—from questions regarding Plaintiff's medical limitations by the FERS disability retirement benefits dispute. (AR 733; *see also* note 30 *supra.*) Since this situation was largely resolved—at least from Fidelity and SAMBA's point of view—not later than February 2001

when Fidelity began to recoup the purported overpayments by withholding Ms. Lamanna's monthly LTD benefit payment, we fail to find any other evidence in the administrative record that would have diverted SAMBA's attention for almost four years from the question of whether she was entitled to those benefits in the first place.

rationale for his professional disagreement.

### B. *Dr. Cosgrove's Opinion Failed to Consider Most Medical Evidence from 2000 through 2004*

After a hiatus of more than four years, SAMBA and/or Fidelity attempted to gather Ms. LaManna's medical records for the period 2000 through 2004 in preparation for Dr. Cosgrove's review in January 2005. It is obvious from prior correspondence that the practice had been for Ms. Lamanna to identify the physicians she consulted during a given period and to sign a blanket medical release. Then SAMBA contacted the individual physicians, requesting her records. (*See* Mr. Dwyer's comment on July 29, 1998, that 17 of 21 doctors on Ms. Lamanna's list should be contacted for their medical records (AR 1167) and letters from SAMBA to those physicians dated August 6, 1998, e.g., AR 67, 70 and 76.)

There is no evidence in the administrative record that Ms. Lamanna was asked to provide such a list from 1998 until she updated her medical treatment report for the period for the period 2000 through February 11, 2003. (AR 969–979.) According to our own count, that report lists by date 43 appointments with Dr. Croen, more than 100 visits to other physicians, and at least two episodes of out-patient surgery and emergency room treatment at two different hospitals, in addition to 18 physical therapy sessions in 2002–2003. The list includes physicians' names and mailing addresses. In an e-mail message, Evelyn Screen stated that SAMBA had made "at least" three unsuccessful attempts to procure these records. In response, JHA, who was arranging the IME

with Dr. Cosgrove, advised Ms. Screen by telephone that "waiting for the 2002 records will not impact the overall review." (AR 766–767.) [33]

The Court is unable to determine why SAMBA or Fidelity was unable to secure Ms. Lamanna's medical evidence for almost two years and why, without knowing what was in those records, the decision was made that they would "not impact the overall review." Nor is there any evidence that SAMBA had made "at least" three attempts to secure those records. That is, unlike August 1998 when SAMBA contacted numerous doctors on Ms. Lamanna's list by fax, no copies of similar letters appear in the administrative record in connection with the 2003 list. In fact, on February 7, 2003, Ms. Screen made a note to the file that she had told Ms. Lamanna she need not provide medical records prior to January 2002 (AR 980), leading to the conclusion that SAMBA made no effort to get records from 1998 through 2002 and that it subsequently decided that records from 2002 through December 2004 were unnecessary. These omissions are substantiated by the fact that Dr. Cosgrove did not refer to any records from that period with the exception of a few of Dr. Croen's office notes and the physical therapy records.

Thus, even if one were to agree with Dr. Neal that Dr. Cosgrove's records analysis was "thorough" because he summarized a great deal of Ms. Lamanna's past medical treatment, by no means could his review have been considered complete. The lack of records from 2000 through 2004—particularly from Dr. Croen, the physician treating her specifically for fibromyalgia and chronic fatigue syndrome-is even more important to the determination of whether

---

**33.** Since both these messages are undated, it is impossible to determine exactly when this exchange took place. It is reasonable to infer, however, that the time period was December 2004 or early January 2005 since that was the period in which SAMBA was attempting to identify a physician to perform another IME.

Ms. Lamanna was able to perform other occupations since there is no other medical evidence which provided a longitudinal evaluation of her physical and mental condition for that period.

Moreover, we question Dr. Cosgrove's opinion that Ms. Lamanna did not meet the criteria for fibromyalgia because she did not have the tender points commonly associated with that impairment. To the contrary, as early as November 1995, Dr. Reeves at the Mayo Clinic had specifically identified tender points on a chart in his medical records and concluded "by history, [she] clearly has fibromyalgia although [she] currently only has 8 tender points." (AR 175–176.) At the other end of the time period, nearly every report from the physical therapy sessions in 2002 and 2003 (which Dr. Cosgrove acknowledged in his report) includes references to various trigger points. *See,* for example, AR 499, reporting "significant myofascial trigger points in trapezius and interscapular muscles" on February 25, 2002; AR 497, "myofascial trigger points in suboccipital, scalenes, scapular, and paraspinal muscles on January 17, 2003"; and AR 486, trigger points in rhomboids, paraspinals, and levators on August 8, 2003.

In connection with this point, Plaintiff argues that SAMBA arbitrarily and capriciously relied on Dr. Cosgrove's opinion that she did not demonstrate the tender points associated with fibromyalgia but failed to mention Dr. Natelson's report in which he noted responses in 17 of the 18 points, thus demonstrating bias in Dr. Cosgrove's conclusions. (Plf.'s Brief at 14.) In response, Defendant argues that to the contrary, Dr. Cosgrove "specifically discussed" Dr. Natelson's findings. (Def.'s Opp. at 3.) In fact, Dr. Cosgrove did refer to Dr. Natelson's office notes and letter of August 17, 2004 (AR 397), but his entire summary of Dr. Natelson's conclusions consisted of the following:

> Evaluation by Dr. Natelson on 7/20/04 indicates chronic fatigue syndrome, fibromyalgia, and sporadic irritable bowel syndrome. She had multiple symptoms and had apparently collapsed while jogging. He recommended a trial of Xyrem.[34] He saw her again on 8/17/04 and indicated that she was 100% disabled because of medical diagnosis [sic] and no evidence of mental illness.

(AR 401.)

The most obvious omission in Dr. Cosgrove's review of Dr. Natelson's findings is the latter's report that she evinced reactions at 17 of 18 tender points and four quadrant pain. Contrary to Defendant's argument, there is no statement by Dr. Cosgrove that he disagreed with Dr. Natelson—in fact, he offered no opinion on Dr. Natelson's findings nor, for that matter, on those of Dr. Levine[35] which were

---

**34.** Xyrem (sodium oxybate) is typically prescribed to prevent attacks of cataplexy, i.e., short episodes of muscle weakness that begin suddenly in narcolepsy patients. Sodium oxybate is in a class of medications called central nervous system depressants and has numerous, very serious, side effects. *See* drugs and supplements entry at MedlinePlus. There is some evidence that xyrem may be helpful in the treatment of fibromyalgia according to a preliminary study reported by M.B. Scharf, *et al.,* in *The Effects of Sodium Oxybate on Clinical Symptoms and Sleep Patterns in Patients with Fibromyalgia,* JOURNAL OF RHEUMATOLOGY (May 2003), abstract available at www.jr

heum.com/abstracts/abstracts03/1070.html, last visited February 29, 2008.

**35.** Dr. Cosgrove's comments about Dr. Levine's findings were: "On 4/15/04, [Ms. Lamanna] came under the care of Dr. Susan Levine for chronic fatigue syndrome. Dr. Levine did extensive laboratory work up. She also ordered an MRI of the brain and MRI of the cervical spine—the results of which are not known. Tilt table was attempted but was unable to be tolerated. Dr. Levine reviewed the laboratory data. She indicated that this was consistent with fibromyalgia/ chronic fatigue syndrome. She opined that the patient

similar to those of Dr. Natelson and also dated from the summer of 2004. We cannot agree that simply summarizing another physician's findings is the same as "specifically discussing" why Dr. Cosgrove disagreed with them.

■ SAMBA stated it "relied" on Dr. Cosgrove's report and that it was consistent with the IMEs performed in 1999. (AR 734.) But it is clear his report was based on an incomplete medical record, in part because SAMBA previously determined that additional information would not change the outcome of his review. Moreover, Dr. Cosgrove was the only IME who had the opportunity to evaluate the recent opinions of two specialists in the relevant fields, yet his report lacks any analysis of how he arrived at conclusions so diametrically opposed to theirs. Consequently, we find SAMBA'S reliance on this report also to be arbitrary and capricious.

### C. *SAMBA Failed to Consider the Opinions of Plaintiff's Treating Physicians*

Plaintiff argues that in the termination letter, SAMBA wholly failed to consider medical records of her treating physicians which indicated a "consistent and unanimous history" of fibromyalgia. (Plf.'s Brief at 17.) Again, Defendant argues that this argument is disingenuous because SAMBA explicitly stated it had reviewed

> all documentation provided to date related to your disability, including the medical information received from your providers and the results from the current and previous IMEs.
>
> . . . .
>
> SAMBA has determined that all documentation necessary to render a decision

was completely disabled from employment. She referred her onto Dr. Natelson and Dr. Langdon." He also summarized the results

on your disability status has been collected and is now part of your file.

(Def.'s Opp. at 3–4, *citing* AR 734.)

We find Defendant's argument that SAMBA adequately reviewed all the medical evidence less than persuasive. As noted above, SAMBA had not received a great deal of medical documentation from Plaintiff's physicians for the period 2000 through 2004. Moreover, although SAMBA stated that all documentation had been reviewed, the only documentation summarized in the termination letter are the three IME reports. (AR 734.) Where the evidence is so strongly divergent, particularly the recent opinions of two specialists who had performed the same type of one-time physical examination as did Drs. Berger and Cosgrove, the failure to offer even a hint of explanation as to the weight given to the reports of Drs. Croen, Pappalardo, Levine, and Natelson is disconcerting.

■ The Court is aware that it may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker*, 538 U.S. at 834, 123 S.Ct. 1965. However, as noted above, the plan administrator may not "arbitrarily refuse to credit" such opinions. Thus, although SAMBA was not required to give any special weight to the opinions of Plaintiff's physicians that she was entirely unable to work at her own or any other occupation, it cannot arbitrarily disregard these opinions. In short, SAMBA's failure to even acknowledge their opinions that chronic pain and fatigue rendered Ms. Lamanna unable to work was arbitrary and capricious. *See Klaassen v. Allstate Cafeteria Plan*, CA No. 06–930, 2007 WL 2461704, *8–9, 2007 U.S. Dist. LEXIS 62886, *23, (M.D.Pa. Aug. 27, 2007) (unjustified refusal

of the lab tests Dr. Levine had ordered, but considered the results "unremarkable." (AR 401.)

to credit the opinions of the treating physician was arbitrary and capricious); *McGuigan*, 2003 U.S. Dist. LEXIS 17593 at *21, 2003 WL 22283831 at *7 (cursory consideration of treating physician's conclusions was evidence of an inattentive review process); *compare Watson v. Metro. Life Ins. Co.*, CA No. 05–3481, 2007 WL 2029291, *5, 2007 U.S. Dist. LEXIS 49938, *14, (E.D.Pa. July 11, 2007) (where plan administrators "thoroughly addressed the subjective opinions of [the claimant's] treating doctors and the objective medical evidence in her file," the fact that defendant gave greater weight to the opinions of its own physicians did not make the decision to deny LTD benefits arbitrary and capricious.)

■ In *Maciejczak v. Procter & Gamble*, CA No. 02–1041, 2006 WL 860150, 2006 U.S. Dist. LEXIS 20341 (M.D.Pa. Mar. 31, 2006), the court outlined why it found the decision to terminate the claimant's LTD benefits was not arbitrary and capricious. As in this case, the claimant's treating physicians repeatedly found (1) he was unable to work due to disabling medical conditions and (2) he was entirely credible as to his subjective complaints of pain. On the other hand, two independent medical examiners found (1) Maciejczak magnified his complaints "far out of proportion" to actual medical results, and (2) although objective medical evidence supported his claim of injury, his impairment was not so severe as to preclude all forms of gainful activity. However, in their letters terminating the claimant's benefits, the plan trustees in *Maciejczak* explicitly set out why they had accepted the medical opinions of the independent medical examiners

as opposed to those of his own physicians, an analysis which is entirely missing in the SAMBA letter of February 10, 2005. Had SAMBA addressed the fact that Plaintiff's physicians reached conclusions directly apposite to those of Drs. Berger, DeBenedetto and Cosgrove and explained—even briefly—why it adopted the latter, we would be hard pressed to find those reasons were not valid. In the absence of such analysis, however, we find SAMBA's reasoning arbitrary and capricious.

D. *SAMBA Did Not Rationally Evaluate Plaintiff's Ability to Perform Other Work*

In the termination letter, SAMBA stated it had "determined that you are capable of engaging in gainful employment, such as the practice of law or related consulting fields, for which you have the requisite qualifications." Inasmuch as that conclusion is without objective support, we find it to be arbitrary and capricious.

All three independent medical examinations on which Defendant relied in the termination letter were performed during the "any occupation" period which began as of April 21, 1998. At that time,[36] the question was whether Ms. Lamanna was "completely unable to engage in each and every occupation for which [she was] reasonably qualified by education, training or experience." The opinions of the medical consultants were not consistent in this regard. In January 1999, Dr. Berger concluded Plaintiff could return to work as an FBI agent if she was not assigned to field work and was limited to an eight-hour day. (AR 271.) In August 1999, Dr. DeBenedetto equivocated, concluding she could not work as an FBI agent, a prosecutor or

---

**36.** We recognize that physicians from Mayo Clinic had reported in 1995, i.e., during the "own occupation" period, that Ms. Lamanna could return to work as an FBI special agent, assuming accommodations were made in working hours and conditions. However, no comparable evidence from Mayo appears in the file for the "any occupation" period, during which both of Plaintiff's treating physicians described her condition as unchanged, unimproved or retrogressing on numerous occasions. *See*, e.g., AR 517–518, 503–504.

litigator, but could perform "management administrative work that does not demand much interpersonal interaction or imply significant stress,-" however, he also doubted her motivation for such work "given her belief that she is physically debilitated by fibromyalgia." (AR 429.) Dr. Cosgrove concluded in January 2005 that she could return to "regular" work and home activities without injury, although he did not define or describe what he meant by "regular." (AR 404.) None of these opinions is supported by even the most cursory explanation of how the doctors arrived at their conclusions.

While the amount of fatigue or pain an individual experiences may be entirely subjective, the extent to which those conditions limit her functional capabilities can be objectively measured. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir.2007); *Boardman v. Prudential Insurance Co. of America*, 337 F.3d 9, 16, n. 5 (1st Cir.2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.") The Court recognizes that plan administrators are not required by ERISA to perform any particular physical examinations, or, in fact, any physical examination at all. We further recognize that tests of strength such as a functional capacity evaluation ("FCE") can neither prove nor disprove claims of disabling pain, nor do they necessarily present a true picture in cases involving fibromyalgia where the symptoms are known to wax and wane, thereby causing test results potentially to be unrealistic measures of a person's ability to work on a regular, long-term basis. *See Brown v. Cont'l Cas. Co.*, 348 F.Supp.2d 358, 367–368 (E.D.Pa.2004); *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F.Supp.2d 846, 856 (E.D.Pa.2001) ("an FCE is a highly questionable tool for

determining whether a fibromyalgia patient is disabled.") But where Ms. Lamanna claimed she could not perform work-like activities on a regular basis, and where the critical question was not whether she suffered from fibromyalgia and/or CFS but rather the extent to which those conditions affected her ability to perform any other suitable work, it seems unreasonable that in a period of approximately six years, neither Fidelity nor any of the consulting physicians suggested that she undergo an FCE or some other method to objectively measure her physical abilities. *Compare*, for example, *Gibson*, 2007 WL 1892486 at *13, 2007 U.S. Dist. LEXIS 47337 at *39 (where Hartford relied, in part, on an FCE in which the consulting physician assessed the frequency with which the plaintiff with fibromyalgia could perform basic physical activities such as grasping with her hands and exercising fine motor skills with her fingers, the decision that the claimant could perform other work was not arbitrary and capricious.)

Moreover, no formal job description for Ms. Lamanna's previous work as an FBI special agent appears in the record. Although Plaintiff provided a list of the types of activities she had performed (*see* AR 285, e.g., investigations of violation of Federal law, arrests, search and seizure, surveillance), there is only a rudimentary description of the physical demands of that job (*see* AR 281, e.g., hours spent sitting, standing, walking; weights lifted and carried; postural functions.) There is no evidence in Dr. Berger's report that he reviewed the job description; thus, his conclusion she could return to work as an FBI special agent if provided certain accommodations must be viewed skeptically since there is no evidence he knew the physical and mental requirements of that job. On the other hand, the conclusion by Dr. Cosgrove that she would not be limited in her "regular work" seems to imply that he believed she could return to work

as an FBI agent; consequently, it does not support SAMBA's statement in the termination letter that although she could not perform her own occupation, she could perform other work.

SAMBA's conclusion that it had determined Ms. Lamanna was capable of engaging in "the practice of law or related consulting fields" appears to be without foundation in the record. Although SAMBA had requested the outside agency to perform a transferable skills analysis on November 11, 2004 (AR 801–802), there is no evidence such an analysis was done or that anyone involved in the decision making process systematically determined the skills and aptitudes applicable to the practice of law or undefined "related consulting fields," nor the physical requirements of those jobs.

■■■ While a plan administrator is under no obligation to conduct a "full-blown vocational evaluation" of a claimant's job, it must make a reasonable inquiry into the types of skills a claimant possesses and whether those skills are transferable to another occupation. *Quinn v. Blue Cross & Blue Shield Ass'n,* 161 F.3d 472, 476 (7th Cir.1998). It logically follows that SAMBA's decision could not rest on reasoned judgment where Drs. Berger, DeBenedetto and Cosgrove had offered only unfounded generalizations or speculation about Ms. Lamanna's ability to perform work-related tasks and there is no evidence SAMBA itself performed any type of work analysis vis-a-vis her medical limitations. *See Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 618 (6th Cir.2006) ("Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability.")

■■■ Where, as in this case, there was no objective evidence such as a voca-

tional assessment or reasoned medical opinions to support the conclusion that Ms. Lamanna could return to work, while medical evidence from her long-term treating physicians indicated total disability, SAMBA had the burden of showing it had a factual basis for its conclusion. *See Blakely v. WSMW Indus.,* CA No. 02–1631, 2004 WL 1739717, *10, 2004 U.S. Dist. LEXIS 14957, *28–29, (D.Del. July 20, 2004), *citing Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381, 391 (3d Cir.2003), for the principle that "once a claimant makes a prima facie showing of disability through physicians' reports ... if the insurer wishes to call into question the scientific basis of those reports ..., then the burden will lie with the insurer to support the basis of its objection." We find SAMBA's conclusion that Ms. Lamanna could perform other work was unfounded in the absence of evidence such as rational analyses from the IMEs, objective examinations such as FCEs, or job skill transferability evaluations.

E. *SAMBA'S Conclusions Reflect a Lack of Understanding of Fibromyalgia and CFS*

In the February 2005 termination letter, SAMBA noted that Dr. Cosgrove indicated Ms. Lamanna had "chronic subjective symptomatology without any objective signs of impairment." He also offered "to review any recent diagnostic studies (i.e., MRI or x-rays)," which SAMBA further stated was "the only additional information of which we are aware that may impact this decision." (AR 734.)

Objective evidence such as blood tests had been used in the early stages of diagnosis to rule out Lyme disease, other rheumatic conditions, viruses such as Epstein–Barr, etc.[37] (*See* AR 224–226.) Objective evidence of tender/trigger points existed in

37. According to the Centers for Disease Control, the following tests may be used to exclude other causes of fatiguing illness, a

notes by Drs. Reeves and Croen and in the physical therapy notes, but were ignored or rejected without explanation by the IMEs. Dr. Levine attempted an objective tilt table test to rule out physical causes of Plaintiff's dizziness and lightheadedness, but the test was inconclusive because Ms. Lamanna's blood pressure and heart rate dropped immediately after an intravenous line was placed, i.e., before the test even began. (AR 869.)

Dr. Cosgrove stated he had "treated hundreds of patients" with fibromyalgia;[38] had diagnosed but did not treat hypothyroidism, and did not treat or diagnose chronic fatigue syndrome "on a regular basis." (AR 619.) There are no comparable statements by Drs. Berger and DeBenedetto, although the Court does note that Dr. Berger is chief of a hospital department of rheumatology, the speciality associated with fibromyalgia. Dr. DeBenedetto appears to be a psychologist or neuropsychologist and there is nothing in the record to show he had any specific expertise regarding fibromyalgia or chronic fatigue syndrome. Therefore, it is not surprising that none of these physicians took into account the fact that Plaintiff was alleging disability on the basis of not only fibromyalgia but also chronic fatigue syndrome. As can be seen by comparing the descriptions of these two conditions

provided above in footnotes 6 and 8, while their symptoms may be similar, they are not identical. Most significantly, a patient with chronic fatigue syndrome does not exhibit the 18 painful tender points associated with fibromyalgia. Therefore, the absence of those points may cast doubt on the diagnosis of fibromyalgia, but does nothing to show Ms. Lamanna was not genuinely disabled from CFS. Yet none of the three consulting examiners analyzed her symptoms and history in the context of chronic fatigue syndrome.

In *Kosiba*, the Court of Appeals found that the district court had erred in part because it did not address the defendant's denial of LTD benefits to the plaintiff in light of her diagnosis of fibromyalgia. Although the plaintiff had been diagnosed with another condition, her doctors concluded part of her disability stemmed from fibromyalgia and the SSA granted benefits principally on that diagnosis. The Court directed that on remand, the lower court should separately consider the defendants' determinations regarding the two distinct conditions. *Kosiba*, 384 F.3d at 68–69. It follows that if a reviewing court errs by failing to address a plaintiff's multiple conditions, the court should give little deference to a plan administrator's decision which also fails to take multiple conditions into account.

threshold criterion to a diagnosis of CFS: alanine aminotransferase (ALT), albumin, alkaline phosphatase (ALP), blood urea nitrogen (BUN), calcium, complete blood count, creatinine, electrolytes, erythrocyte sedimentation rate (ESR), globulin, glucose, phosphorus, thyroid stimulating hormone (TSH), total protein, transferrin saturation, and urinalysis. If autoimmune disease is suspected on the basis of initial testing and physical examination, the physician may request additional tests, such as for anti-nuclear antibodies. Dr. Danehower had used several blood tests in 1994, as did Dr. Levine in 2004, in an effort to rule out other potential causes of chronic fatigue. It is beyond the ability of this Court to independently interpret the results of the

numerous laboratory tests which appear in the record. (See, e.g., Dr. Neal's list at AR 43.) However, even if the administrative record includes the results of tests such as those listed above, none of them allows a physician specifically to confirm or exclude the diagnosis of chronic fatigue syndrome. *See* Center for Disease Control, Chronic Fatigue Syndrome, at www.cdc.gov/cfs/cfsdiagnosis.htm (last visited February 28, 2008.)

**38.** The Court notes in passing that despite having treated "hundreds of patients with fibromyalgia," Dr. Cosgrove's extensive curriculum vita reveals no publications or presentations on the subject during the period 1983 through 2005. (*See* AR 620–631.)

It is well-established in ERISA and Social Security disability cases that fibromyalgia and chronic fatigue syndrome are both conditions for which objective clinical tests such as blood or other laboratory tests, x-rays, and MRIs, do not exist. *See,* e.g., *Perl v. Barnhart,* CA No. 03–4580, 2005 WL 579879, *3, 2005 U.S. Dist. LEXIS 3776, *10 (E.D.Pa. Mar. 10, 2005) ("because objective tests may not be able to verify a diagnosis of fibromyalgia, the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination"); *Brown,* 348 F.Supp.2d at 369 (even if an ERISA administrator may impose a requirement for "objective" medical evidence that does not appear explicitly in a plan's terms, it would be unreasonable to do so in the case of a fibromyalgia patient because such a requirement would effectively preclude any such patient from qualifying as totally disabled); and *Lemaire,* 69 Fed.Appx. at 93 ("To require 'objective' medical evidence to establish the etiology of chronic fatigue syndrome, which is defined by the absence of objective medical evidence ... creates an impossible hurdle for claimants and is arbitrary and capricious under the heightened standard we apply in this case.")

Even the most reliable of the quasi-objective tests for fibromyalgia, i.e., pain with pressure on 11 of the 18 identified tender points, may or not prove or disprove the diagnosis. *See Sanderson v.*

*Cont'l Cas. Corp.,* 279 F.Supp.2d 466, 476 (D.Del.2003), and *Scott v. Hartford Life & Accident Ins. Co.,* CA No. 03–3696, 2004 WL 1090994, *4–5, 2004 U.S. Dist. LEXIS 8702, *13–14 (E.D.Pa. May 13, 2004) (discussing the "pressure point" or "tender point" test as a means of diagnosing fibromyalgia.) Moreover, the doctor conducting the examination must rely, at least in part, on the patient's subjective statements about the extent of pain he is experiencing. *See Klein v. Betzdearborn Long–Term Disability Plan,* CA No. 01–4600, 2002 WL 32348334, *1–2, 2002 U.S. Dist. LEXIS 13943, *3–4 (E.D.Pa. July 9, 2002) (recognizing "[t]here is no way a physician can diagnose fibromyalgia without relying on a patient's self-reported statements that he or she is feeling pain or tenderness during the examination.") Although the presence of at least eleven tender points is "a strong diagnostic criterion for the disorder," some physicians believe there is no need to have that number of tender points to be diagnosed and treated for fibromyalgia. *Peters v. Comm'r of Soc. Sec.,* CA No. 05–4696, 2006 WL 3780660, *2, n. 1, 2006 U.S. Dist. LEXIS 92342, *5, n. 1, (D.N.J. Dec. 19, 2006).[39] It is equally well accepted in case law and the medical literature that claimants can fake their response to this most objective test and that because the intensity and location of symptoms may wax and wane, the tender point test may not always be reliable. *See Post,* 501 F.3d at 159, n. 2.[40] The Third Circuit Court of Appeals has found it arbitrary

**39.** The source for this conclusion in *Peters* is an internet site which apparently no longer exists. However, the same opinion can now be found, for example, at http://www.fibromyalgia-symptoms.org/fibromyalgia_diagnosis.html (last visited February 26, 2008), which notes fibromyalgia may be diagnosed with less than 11 tender points if the patient also demonstrates widespread pain and other common symptoms such as sleep disorders and irritable bowel syndrome.

**40.** As the Court of Appeals noted, "In the words of Judge Posner, fibromyalgia is a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features.... Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symp-

and capricious to require clinical evidence of diseases such as fibromyalgia and CFS for which such evidence cannot be produced. *Mitchell,* 113 F.3d at 442–443.

Thus, the conclusions by Drs. Berger, DeBenedetto, and Cosgrove that Plaintiff did not have "true fibromyalgia" because there was little or no "objective evidence" in Plaintiff's medical records to support this diagnosis are without foundation. Had they reached a similar conclusion regarding CFS (which, of course, they did not because they failed entirely to address the diagnosis), that conclusion would have been equally unsupported. Finally, Dr. Cosgrove's offer to review "any recent diagnostic studies," e.g., "MRI or x-rays," and SAMBA's statement that such studies were the "only additional information of which we are aware that may impact this decision" cast doubt on whether SAMBA truly understood the characteristics of these conditions since the results of neither x-rays nor MRIs can in any way prove or disprove the existence, or the seriousness of the effects, of fibromyalgia or CFS.

Finally, the viewpoint that there was no objective evidence in the record to support Ms. Lamanna's claim of total disability be-comes even more troubling when one considers that she specifically asked what medical evidence was needed to show the severity of her chronic fatigue syndrome. On May 3, 2004, Plaintiff's attorney wrote to Walter Wilson, Executive Director of SAMBA. Among other points raised in this letter, Mr. Riemer asked SAMBA to:

> Please specifically describe:
>
> a. The specific type of objective evidence (e.g., MRI, x-ray, laboratory results, etc.) that Ms. LaManna should provide in order to adequately support her claim ....
>
> b. The specific clinical findings that Ms. Lamanna should provide....
>
> c. The specific type of evidence that Ms. Lamanna must submit to adequately support her claims of fatigue and/or pain.
>
> In other words, given Ms. Lamanna's disability and the terms of the plan, please tell Ms. Lamanna what specifically she must submit in order to demonstrate total disability under the plan.

(AR 906.)

In response, Mr. Wilson wrote:

> Finally on page 3 of the [May 3, 2004] letter, you assert that the March 12 letter [41] does not include an adequate

---

tom that discriminates between it and other diseases of a rheumatic character—multiple tender spots ... that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch." *Post, id., quoting Sarchet v. Chater,* 78 F.3d 305, 306–307 (7th Cir.1996).

**41.** The letter of March 12, 2004 was a final decision by SAMBA that Ms. Lamanna would be required to reimburse Fidelity for a portion of the LTD benefits she had received while also receiving disability retirement benefits from the FBI. (AR 917–921.) In the last paragraph of the March 12 letter, Mr. Wilson had written: "We also note that in March 1999, SAMBA reported the results of an inde-pendent medical examination to Ms. Lamanna (Attachment 6), and we explained the [sic] Fidelity Security was continuing to pay her disability benefits under a reservation of rights. A subsequent IME report (Attachment 7) confirmed the earlier findings, which suggest, among other things, that Ms. Lamanna's disability is subject to the two year limitation on coverage of disabilities 'caused by, contributed to, or resulting from a mental, psychoneurotic, or personality disorder of the Member,' unless the member is confined in an institution. At this ten year point in the claim, we plan to arrange for updates on these IMEs." (AR 921.) Although other documents which are referred to as attachments to this letter are provided (*see* AR 922, a request for release of information by the SSA, and AR 923, consent for release of information by the Office of Personnel Management at the FBI),

explanation of what specific objective evidence concerning Ms. Lamanna's chronic fatigue syndrome is missing from her claims file. We find your assertion misplaced as we have not denied Ms. Lamanna's claim to date.

(AR 900–902.)

 A review of the relevant portion of the March 12, 2004 letter (set out in the margin at note 41), that is, the statement by Mr. Wilson that SAMBA intended to get updated IMEs addressing both Ms. Lamanna's physical condition and the alleged "psychological overlay," leads the Court to conclude that Mr. Riemer's questions about what evidence she needed to present was entirely appropriate, particularly since both Dr. Berger and Dr. Debenedetto had strongly implied that Ms. Lamanna's chronic pain and fatigue were entirely psychosomatic. Yet Mr. Wilson's reply to his questions was entirely non-responsive. That is, rather than explaining what evidence Plaintiff could provide to support her claim of total disability, Mr. Wilson evaded the question (or did not know the answer) by turning the procedure on its head—only after SAMBA denied the claim for benefits would there be any need or opportunity to provide objective evidence of her disability. In sum, although SAMBA subsequently denied benefits because there was no "objective evidence" to support her claim that she was disabled from any occupation due to the severity of her fatigue and pain, SAMBA refused to advise Plaintiff before that time what evidence would be persuasive. In our opinion, Mr. Wilson's response is evidence either of an ongoing bias against Plaintiff's claim, his inattention to or lack of knowledge of the claims procedure, or both. See Schleibaum v. Kmart Corp., 153 F.3d 496, 499–500 (7th Cir.1998) (claims administrator committed procedural error by failing to provide the ultimate reason for its denial at a time when the claimant could have done something about it and/or submitted additional information to perfect his claim.) While we do not dispute the fact that under ERISA, an insurance company is under no specific duty to gather information itself (see, e.g., Sollon, 396 F.Supp.2d at 586, citing Pinto, 214 F.3d at 394, n. 8), it seems unreasonable that when a claimant specifically inquires as to what evidence she needs to provide in order to satisfy the decision maker that she is totally disabled, the purported answer to that question is, at best, evasive and non-responsive. Compare Fiorentino v. PNC Bank Corp., CA No. 03–3417, 2004 WL 1813221, *10–11, 2004 U.S. Dist. LEXIS 15396, *31–32 (E.D.Pa. July 19, 2004) (finding decision to deny benefits arbitrary and capricious in part because the insurer refused to help plaintiff gather certain information and later relied on the absence of such information to deny his claim.)

 In conclusion, we find SAMBA's misplaced reliance on medical reports which inappropriately required objective evidence of conditions for which there is no such evidence, plus SAMBA's failure to respond to Ms. Lamanna's questions regarding other alternative persuasive evidence was arbitrary and capricious.

## VII. REMEDY

 ERISA provides discretion in identifying "appropriate equitable relief" where the court has determined that the plan administrator acted arbitrarily or capriciously. 29 U.S.C. § 1132(a)(3); see also Carney v. IBEW Local Union 98 Pension Fund, 66 Fed.Appx. 381, 387 n. 2 (3d Cir.2003), cert. denied, 540 U.S. 1073, 124 S.Ct. 924, 157 L.Ed.2d 743 (2003). The court may remand the case for re-

Attachments 6 and 7 are not included consecutively in the file. The context implies they were, respectively, the IME reports by Drs. Berger and DeBenedetto.

evaluation of the claim or retroactively award benefits. *Carney, id.* at 387; *Cook v. Liberty Life Assur. Co.,* 320 F.3d 11, 24 (1st Cir.2003).

■ Having found at least five reasons to conclude that the decision to terminate Ms. Lamanna's long-term disability benefits on the grounds that she purportedly was able to perform other occupations was arbitrary and capricious, we further conclude reinstatement of benefits is the appropriate remedy. *Porter v. Broadspire,* 492 F.Supp.2d 480, 491 (W.D.Pa.2007); *see also Addis v. Ltd. Long–Term Disability Program,* 425 F.Supp.2d 610, 621 (E.D.Pa. 2006) (where the administrator inappropriately considered and evaluated the evidence, the proper remedy was to award benefits.) Although SAMBA may, of course, re-consider Ms. Lamanna's ongoing eligibility for benefits under the "any occupation" standard in the future, benefits will be retroactively awarded from January 30, 2005, through the date of this Opinion.

■ In addition to retroactive benefits, Plaintiff also seeks attorney's fees and costs associated with bringing this suit. Under 29 U.S.C. § 1132(g)(1), the Court may, again in its discretion, award attorney's fees to a prevailing party; however, there is no presumption that such an award is automatic. *See Ellison v. Shenango, Inc. Pension Bd.,* 956 F.2d 1268, 1273 (3d Cir.1992); *Jaqielski v. Metro. Life Ins. Co.,* CA No. 06–1081, 2007 WL 2907277, \*1, 2007 U.S. Dist. LEXIS 72828, \*1 (W.D.Pa. Sept. 28, 2007).

In order for the Court to consider this issue properly, as set forth in more detail in the Order of Court filed concurrently herewith, Plaintiff shall file a petition for prejudgment interest, attorney's fees and costs, stating her arguments as to why she should be entitled to the same, pursuant to the factors established in *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.

1983), as discussed in *Ellison, id.* Defendant's response thereto shall follow.